**B**

11/23/2022

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.                    SUPERIOR COURT DEPARTMENT

                              CIVIL ACTION NO.:

                              **RECEIVED**

|  |  |
|---|---|
| JEFFREY T. WORTHLEY, <br><br> Plaintiff, <br><br> v. <br><br> SCHOOL COMMITTEE OF GLOUCESTER; and BEN LUMMIS, in his official and personal capacities, <br><br> Defendants. | **COMPLAINT FOR VIOLATION OF** <br><br> 1. **42 U.S.C. § 1983 (FIRST AMENDMENT)** <br> 2. **42 U.S.C. § 1983 (DUE PROCESS)** <br> 3. **G.L. c. 12, § 11 (FREE SPEECH)** <br> 4. **G.L. c. 12, § 11 (DUE PROCESS)** <br> **AND DEMAND FOR JURY TRIAL** |

This is a Civil Action brought by Plaintiff Jeffrey T. Worthley against Defendants School Committee of Gloucester and its Superintendent, Ben Lummis. Worthley brings claims under 42 U.S.C. § 1983 and G.L. c. 12, § 11 for Defendants violation of Worthley's First Amendment rights, Fourteenth Amendment due process rights, freedom of speech rights under art. 16 of the Massachusetts Declaration of Rights, as amended by art. 77 of the Amendments to the Massachusetts Constitution, and procedural due process under Part II, c.1, § 1, art. 4, of the Massachusetts Constitution, and arts. 1, 10 and 12 of the Massachusetts Declaration of Rights when Defendants issued an unlawful and retaliatory no trespass order, and alleges as follows:

**THE PARTIES**

1.     Plaintiff Jeffrey T. Worthley is a Councilor at-Large on the City Council for Gloucester, Massachusetts, and has a lifetime of public service behind him.

2.     Defendant School Committee of Gloucester is organized pursuant to G.L. c. § 31 and Article 4, Section 4-1(a) of the Code of Ordinance, City of Gloucester, Massachusetts, that exercises control and management of the public schools of the City of Gloucester.

**RANDAZZA** | LEGAL GROUP

3.      Defendant Ben Lummis is the Superintendent of Gloucester Public Schools and, at all relevant times, resided in Massachusetts.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this civil action per G.L. c. 212, § 3, as there is no reasonable likelihood that recovery will be less than or equal to $25,000.

5.      This Court has personal jurisdiction over Defendants generally, as they are domiciled in the Commonwealth of Massachusetts, and specifically, per G.L. c. 223A, §§ 3(a) and (c), as this matter arises from Defendants' transaction of business in the Commonwealth and causing tortious injury by act and omission in the Commonwealth.

6.      Venue is proper in Essex County per G.L. c. 223, § 1, as Defendants School Committee of Gloucester and Lummis have their usual place of business therein.

## FACTUAL BACKGROUND

7.      Jeffrey Worthley is an elected official in Gloucester Massachusetts and has served as a councilor-at-large on the Gloucester City Council, having been most-recently elected in November 2021 to a two-year term.[1]

8.      On November 8, 2022, Worthley went to Gloucester High School to vote, as this is his polling station.

9.      Although school was not in session, the Gloucester High School student government set up a table for a bake sale adjacent to the line to enter the polls. Worthley was one of approximately 15-20 voters in proximity to the bake sale at the time.

---

[1] The facts recited in this Complaint are supported by the accompanying declaration of Jeffrey T. Worthley, attached as **Exhibit A**.

10.     Worthley introduced himself to the students manning the bake sale and commended them for their efforts. One student, who identified herself as a student government leader, introduced herself in response. As this individual is a minor, she will be named in this complaint as KF.

11.     Worthley informed KF that he would purchase some baked goods after he voted, as he did not want to take baked goods in the polling booth with him. Were there no baked goods left, Worthley indicated he would have made a donation. KF said that there may be none left, as not many people had followed through providing baked goods.

12.     Worthley, as a City Councilor and civic-minded individual responded, relating his own experiences in student government, at that same high school, and sharing ideas about how to increase civic engagement and fundraising. KF appeared delighted to hear the suggestions.

13.     KF expressed disappointment that she was unable to generate involvement from classmates, but she was beginning to survey students on the best ways to reach them. Worthley noted the impact of a handwritten note, much like the Drama Club's handwritten notes to all of the City Councilors, inviting them to performances. KF then offered Worthley the phone number of her friend in the Drama Club, who wrote the notes, so he could thank her himself, but Worthley declined to receive a phone number without consent. He also declined KF's request that she give his number to the friend.

14.     After voting, Worthley mentioned that the City Council President was interested in reinstituting "student government day" and KF expressed keen interest in that idea.

15.     Worthley, who had been attempting to reach Defendant Lummis since January 2022 (who never responded) about inspiring student volunteerism, then explained to KF that he had worked on a volunteer project to clean up a local field, and that he had plans to create a

volunteer corps in Gloucester, akin to a local version of the Peace Corps ("Gloucester Volunteer Corps"). Along with his 6th grade daughter and 8th grade son, Worthley was able to generate sufficient interest to inspire 84 volunteers to help with a downtown clean-up event. Worthley has around 50 Gloucester citizens already involved with his volunteer initiative. Apparently eager to network with a similarly civic-minded leader, KF expressed interest in the project, and asked Worthley for his phone number.

16.    Worthley's number was already easily available on his public Facebook page, on the City's website, and on his City of Gloucester business cards. Therefore, Worthley gave her his number in lieu of her bothering to find it online in seconds.

17.    KF then immediately dialed his number and said "now you have my number too."

18.    A true and correct copy of a screenshot of her call (with telephone number partially redacted) appears below. This proves that KF initiated phone contact.



Complaint and Demand for Jury Trial

RANDAZZA | LEGAL GROUP

19.     When Worthley returned to his car, he saw that KF's call at 1:35 p.m. had come in

from a number that his iPhone auto-identified as coming from KF's mother – as the iPhone draws

from other information on the phone to suggest who the call may have been from.

20.     Worthley then looked up the name on Facebook and saw that he was Facebook

friends with KF's mother.

21.     Worthley then responded to KF's overture at 1:49 p.m.

22.     Specifically, Worthley dictated a text message, stating:

**Hello [KF]. It was very nice meeting you today. Good luck with the bake sale. I've been working on an idea to reinspire and reinvigorate volunteerism in our community. My kids and I organize[d] a downtown cleanup event starting at Burnham's field back in September and we got 84 people to volunteer. We organize[d] the painting of the rails and fencing around the mill pond and Mill River. It is my belief that more people want to help that [sic] are currently helping; they just need to be invited. And, also organized. This idea I have draws from inspiration that John F. Kennedy had including the peace corps. I'm not comparing myself to him but I want to create the Gloucester corps of volunteers.**

**And I think it starts with inspiring the next generation probably beginning as early as middle school. There's a lot of steps to it. And I don't have it figured out yet. I just know it's needed and I want to put my focus and attention on this.**

**I'm not even sure what the total of my ask would be but I'd like to ask you if you would like to be involved in this movement I. [sic] At a minimum it would mean communicating to students and teachers at some point to help develop this.**

23.     Worthley, who had been a young a civic leader, was looking to engage the future

civic leaders. Worthley himself first ran for Gloucester City Council at the age of 22. He lost that

first election, but won two years later, and again two years after that. At age 28, he first ran for

Mayor.

24.     KF responded later that evening at 9:30 p.m.:

**Hi! Sorry for the late text but I wanted to be sure to get back to you.  It was great to meet you today too! Your plan sounds awesome.  At this time I wouldn't be able to respectfully dedicate myself to this movement, as I'm apart [sic] of a bunch of different clubs and boards through the school that take up a lot of my time.  I'd love to get bak to you and help out once things settle down for me.  Thank you so much and best of luck!**

25.     Worthley replied, assuaging KF's concerns about the late time of the text, noting that he would either be up late or his phone would be on silent—either way, the time she responded was of little concern.  Turning to the substance of the Gloucester Volunteer Corps idea, Worthley indicated that he "**wouldn't need [KF] to dedicate any time to this movement at this point**" and that he wanted to consult "**periodically**" based on "**what [her] schedule would allow**".  He indicated he was looking for data and how to best communicate with other student leaders.  Of course, Worthley's idea for Gloucester Volunteer Corps could use leaders like KF, but as to KF herself, Worthley indicated that he "**completely understand[s]" if she does not have the time and that he would pursue Gloucester Volunteer Corps "through the class advisors**".

26.     True and correct copies of the foregoing messages are attached as **Exhibit B**.  And, these represent the entirety of the conversation between Worthley and KF.

27.     The next morning, KF's father called Worthley to explain that KF was over-extended in her volunteer activities, and she would not be available to work on any of the outreach programs they discussed.

28.     Worthley accepted KF's father's declination to participate on behalf of his daughter.  Worthley told her father he would delete her number from his phone.  Worthley then summarized the discussion in a text message to KF's father, attached as **Exhibit C**.

29.     On November 14, 2022, at approximately 1:00 p.m., Worthley received a call from Gloucester City Attorney Suzanne Egan; he answered, assuming she was calling regarding legislative work.  Egan insisted he come in for meeting at 2:30 p.m. with herself, Human Resources Director Holly Dougwillo, and Police Chief Ed Conley.

30.     Worthley was told the meeting was in reference to his so-called "inappropriate communications with a female minor student."

31.     Of course, the communications were wholly proper constituent communications.

32.     At the meeting, Worthley provided and read from the text messages.

33.     Chief Conley explicitly advised Worthley that no crime had been committed and that he was not under investigation for a crime.

34.     Egan then ambushed Worthley with a "no trespass" letter, purportedly from Lummis, that was unsigned and during that meeting, Egan said that his proper communications with KF were "inappropriate," and that while his constituent communications with KF had violated neither a law nor any other rule, Worthley was told that he was banned from coming on the Gloucester High School campus for the rest of the school year.

35.     The letter grossly, maliciously, and knowingly mischaracterized and misrepresented the anodyne constituent communications between Worthley and KF.

36.     In response to Worthley inquiring how the No Trespass Order could issue without an investigation, Chief Conley responded that Worthley "**may feel as though [his] due process rights have been violated, and I would likely agree with [him], but that this is a much better result than the alternative**."

37.     This "alternative" was never discussed.  Whatever this meant, it was a threat that Worthley should not expect nor desire nor seek due process.  It was also a clear admission that there was no due process.  Worthley declines to be intimidated by these threats.

38.     There was, indeed, no due process provided to Worthley.  No notice.  No investigation.  No opportunity to be heard.  No opportunity to appeal.  Conley stated that the only way to change the outcome would be in the courts.

39.     Worthley was also falsely informed at this meeting that the matter was "private" and would not be disclosed to third parties.

40.     Egan said that the letter would not be sent by official means, because she said she wanted to keep it off city servers or out of city files, because then it would be a public record. Worthley was confused about why a City Attorney would take such an action clearly calculated to evade public records laws.[2]

41.     Later that evening, Worthley emailed Egan for clarification about the letter. Egan responded with a signed version of the No Trespass letter, now on proper letterhead. Lummis had an opportunity to review the messages, yet still maintained his false, misleading, and retaliatory narrative.

42.     On November 14, 2022, Defendant Ben Lummis had issued a signed no trespass order ("No Trespass Order") against Worthley that prohibits him entering the Gloucester High School grounds or attending any school sponsored activities or events until the end of the 2022-2023 school year. **Exhibit D**.

---

[2] This was especially confusing in hindsight, given that Defendants immediately provided information about this matter to the press.

43.     This No Trespass Order continues to maintain the knowingly false narrative that Lummis concocted in order to maximize the damage to Worthley and to his reputation.

44.     Lummis falsely claimed that Worthley's discussions with KF "poses a threat to the safety of the Gloucester High School community."

45.     Worthley called Egan, and they spoke. Worthley requested readily-refuted factual errors be corrected and that he wished to meet with Lummis about the matter.  Worthley indicated that the No Trespass letter meant he would be unable to attend graduation day or watch his son play Taps on the coming Memorial Day (he had played it Memorial Day and Veteran's Day 2022) or any other school events.

46.     It is commonplace, and in fact expected, that local politicians attend events at Gloucester High School.

47.     Shortly thereafter, Egan called Worthley to tell him that Lummis refused to meet with him and there would be no exceptions to the blanket ban on Worthley's rights.

48.     Lummis then saw fit to issue a statement to the Gloucester Daily Times, about the matter, providing just enough information to call Worthley's character into question, but without enough information to let the public know the truth.  **Exhibit E**.[3]

49.     In neither the No Trespass Order nor the public statement did Lummis provide any violations that justify expelling Worthley, an elected official, from Gloucester High School during school hours or from school sponsored events or activities.

---

[3] The fact that the matter was initially declared "private" but then Lummis and/or other agents of his decided to selectively inform the press about the matter suggests that this entire event was designed to be an attack on Worthley, and not that it was merely the result of complete incompetence by Lummis and City Attorney Egan.  Something worse than mere incompetence is in play here, and discovery will be targeted to finding out what.

50. Lummis has provided no legal basis for the No Trespass Order and no opportunity for Worthley to contest No Trespass Order.

51. Lummis has proffered no administrative, school, nor any other rule that Worthley allegedly violated.

52. Any purported basis for the No Trespass Order stems from an incident that occurred on election day. Gloucester High School was not in session during the time. Worthley was not attending a school sponsored event or activity. There is no rational basis between the No Trespass Order and the alleged incident.

53. As a member of the City Council, it is necessary for Worthley to have a working relationship with Gloucester Public Schools and to have the freedom to attend school sponsored events and activities.

54. Further, there is a strong tradition in Gloucester for elected officials to attend events at the schools, and to engage constituents, even those who are not yet of voting age, in community events and volunteer programs.

55. The "incident" could not have been more innocent nor non-threatening. However, for retaliatory, ignoble, and dishonest reasons, Lummis saw fit to both mischaracterize the discussions and to publish just enough vague information to try to harm Worthley's reputation, without making it clear that his narrative was false, misleading, and retaliatory.

56. Any reasonable person who sees the communication between Worthley and KF can see that Lummis's characterization of the events was clearly false.

57. Specifically, although the No Trespass Order makes the following purported factual recitation, the evidence demonstrates numerous falsehoods. Those falsehoods and misrepresentations are noted in red and are otherwise footnoted:

It has been reported to me that on November 8, 2022, while the Gloucester High School was used as a polling location, you approached a minor female student[4] and **used your official position as city councilor promising to assist her with her studies and extracurricular activities through your involvement in a school and city sponsored programs to obtain her personal cell phone number**. You **specifically targeted** this female student and **did not include the other students at the event**,[5] you did not seek the permission of an adult before obtaining the minor's telephone number,[6] and **you represented that you were involved in an official school or city program**. Later that evening you communicated with her about **your sleeping habits and other personal interests**.[7] When confronted by the female minor's parent, you **misrepresented the facts** and asserted that the student initiated the text communications.[8]

58.     Lummis' characterization of the events is either knowingly false or recklessly so.

59.     Lummis' characterization is clearly intended to take a completely innocent encounter, and to spin it to seem as if it is a scandalous event.  To craft such a misleading, malicious, and overly-dramatized version of such an innocent event was no small creative endeavor.  The effort that had to be put in to such a twisted recitation of the facts demonstrates a clear desire to engage in a malicious campaign against Worthley.

60.     This abuse of authority and position, under the guise of "safety" actually compromises the safety of both students and other members of the public.  Accordingly, whatever Lummis' motivation was behind this, it calls his judgment, character, and ability to discharge his duties as superintendent.

---

[4] She was running a bake sale, inviting potentially hundreds of voters that day to approach and speak to her.

[5] There was one other student, and she participated in the discussion intermittently between conversations with other adults at the table purchasing baked goods.  There were no other students present at the bake sale. No one was targeted or excluded.

[6] This is misleading as he did not seek her number.

[7] He mentioned her message was not too late and it was a community interest, not personal.

[8] He did no such thing.  He stated the truth.

61.     Lummis knew at all times that his actions were unconstitutional, retaliatory, and the intent of them was to harm Worthley's reputation, to retaliate against him for both speech and petitioning activity, and thus qualified immunity does not apply to Lummis' actions.

### CAUSE OF ACTION
### *Count I*
### Violation of the First Amendment to the United States Constitution
### (42 U.S.C. § 1983 – First Amendment)

62.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set out in full herein.

63.     Worthley had not only a right, but a responsibility to communicate with his constituents and to try and further his "Gloucester Volunteer Corps" project.

64.     KF is one of Worthley's constituents.

65.     All of Worthley's communications with KF were proper constituent communications and were proper communications for the purpose of generating civic involvement in a volunteer program.

66.     Defendants' conduct of issuing a No Trespass order forbidding him from entering Gloucester High School or attending school sponsored events or activities due to his constitutionally protected activity, namely engaging in political speech and petitioning activity is unconstitutional and violates his First Amendment rights to freedom of speech, expression, petitioning, and freedom of assembly.

67.     Defendants' conduct of enforcing the No Trespass Order is unconstitutional and violates his First Amendment rights to freedom of speech and expression, and freedom of assembly.

68.     Defendants retaliated against Worthley for exercising his First Amendment rights.

69.     It is clearly established that there is a First Amendment right to speak freely and assemble, especially in the context of a City Councilor to a constituent about a community volunteer program.

70.     Worthley was entitled to exercise those rights by engaging in constituent communications with KF.

71.     Defendants' restriction on Plaintiff's speech is content-based and viewpoint discrimination and is in violation of the First Amendment.

72.     Plaintiff has been injured, or reasonably fears imminent injury, by these constitutional violations, and Plaintiff is entitled to relief.

### *Count II*
### Violation of the Fourteenth Amendment to the United States Constitution
### (42 U.S.C. § 1983 – Procedural Due Process)

73.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

74.     Defendants' conduct of issuing a No Trespass Order, forbidding Plaintiff from entering Gloucester High School and attending school sponsored events or activities for the 2022-2023 school year due to his constitutionally protected activity, is unconstitutional and violates his rights to due process under the Fourteenth Amendment.

75.     Defendants' conduct of enforcing the No Trespass Order is unconstitutional and violates Plaintiff's due process rights under the Fourteenth Amendment.

76.     Further, the lack of any administrative review process means there is no possible meaningful relief.

77.     Prior to being deprived of the rights to speak freely and to assemble and attend community events, Plaintiff was entitled to due process.  However, rather than afford Plaintiff due

process, Defendants issued a fiat that he cannot be present at school events or school grounds, including Gloucester High School sporting events and other events for his child, who plays in the school band.

78.     There was no hearing, no opportunity to be heard, nor was there any due process whatsoever.  There was merely an arbitrary, capricious, and malicious action designed to harm Worthley, for no proper purpose at all.

79.     Plaintiff has been injured, or reasonably fears imminent injury, by these constitutional violations, and Plaintiff is entitled to relief.

### *Count III*
### **(G.L. c. 12, § 11I – Retaliation)**

80.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

81.     Worthley was engaged in activity protected by art. 16 of the Massachusetts Declaration of Rights, as amended by art. 77 of the Amendments of the Massachusetts Declaration of Rights when engaged in conversation with his constituent.  His actions constitute speech on an important matter of public concern and therefore are afforded a high level of protection from government interference.

82.     Defendants retaliated against Plaintiff's protected speech by issuing a no trespass order.  They compounded this retaliation by doing so in a manner designed to harm Worthley's reputation and to impede his ability to act as a public servant.

83.     It is clearly established that there is a constitutional right for an elected official to engage in conversation with one of his constituents.

84.     Defendants' restriction on Plaintiff's speech is content-based and viewpoint discrimination and is in violation of the First Amendment.

85.     Plaintiff has been injured, or reasonably fears imminent injury, by these constitutional violations, and Plaintiff is entitled to relief.

### Count IV
### (G.L. c. 12, § 11I – Procedural Due Process)

86.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

87.     Defendants' conduct of issuing a No Trespass Order, forbidding Plaintiff from entering Gloucester High School and attending school sponsored events (on campus or not) or activities for the 2022-2023 school year due to his constitutionally protected activity, is unconstitutional and violates his rights to due process under the Massachusetts Constitution and the Massachusetts Declaration of Rights.

88.     The lack of administrative review means there is no possible meaningful relief.

89.     Prior to being deprived of the rights to speak freely and to assemble and attend community events, Plaintiff was entitled to due process. However, rather than afford Plaintiff due process, Defendants issued a fiat that he cannot be present at school events or school grounds, including Gloucester High School sporting events and other events for his child, who plays in the school band.

90.     There was no hearing, no opportunity to be heard, nor was there any due process whatsoever.  There was merely an arbitrary, capricious, and malicious action designed to harm Worthley, for no proper purpose at all.

91.     Plaintiff has been injured, or reasonably fears imminent injury, by these constitutional violations, and Plaintiff is entitled to relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jeffrey Worthley asks this Court to issue and award:

A.      A declaration that the No Trespass Order issued by Defendants is unconstitutional under the First and Fourteenth Amendments of the United States Constitution;

B.      A declaration that the No Trespass Order issued by Defendants is unconstitutional under art. 16 of the Massachusetts Declaration of Rights, as amended by art. 77 of the Amendments to the Massachusetts Constitution and Part II, c.1, § 1, art. 4, of the Massachusetts Constitution, and arts. 1, 10 and 12 of the Massachusetts Declaration of Rights;

C.      A preliminary and permanent injunction enjoining each Defendant from interfering with Plaintiff's right to lawfully engage in constitutionally protected activity in Gloucester, Massachusetts;

D.      Damages in an amount to be determined at trial;

E.      An award of attorney's fees, cost, and expenses under 42 U.S.C. § 1988, G.L. c. 12, § 11I, and any other applicable law; and

F.      Any further relief this Honorable Court deems appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on each claim asserted or hereafter asserted in the Complaint, and on each defense asserted or hereafter asserted by the Defendants.

Dated: November 23, 2022.  Respectfully Submitted,

/s/ Marc J. Randazza
Marc J. Randazza, BBO# 651477
mjr@randazza.com, ecf@randazza.com
Jay M. Wolman, BBO# 666053
jmw@randazza.com
Randazza Legal Group, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (978) 801-1776

Attorneys for Plaintiff,
Jeffrey T. Worthley

# **Exhibit A**

## Declaration of
## Jeffrey T. Worthley

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.                       SUPERIOR COURT DEPARTMENT

                                        CIVIL ACTION NO.:

|  |  |
|---|---|
| JEFF WORTHLEY,<br><br>       Plaintiff,<br><br>   v.<br><br>SCHOOL COMMITTEE OF<br>GLOUCESTER; and BEN LUMMIS, in<br>his official and personal capacities,<br><br>       Defendants. | **DECLARATION OF**<br>**JEFF WORTHLEY** |

I, Jeff Worthley, declare under the penalties of perjury the following:

1.      I am over 18 years of age and have never been convicted of a crime involving fraud or dishonesty.

2.      I am the Plaintiff in the above-captioned matter, and I have first-hand knowledge of the facts set forth herein, and if called as a witness, could and would testify competently thereto.

3.      I am a Councilor at large on the Gloucester City Council, having been most-recently elected in November 2021 to a two-year term.

4.      On November 8, 2022, I went to Gloucester High School to vote.

5.      Although school was not in session, the Gloucester High School student government set up a table for a bake sale adjacent to the line to enter the polls. I was one of approximately 15-20 voters in proximity to the bake sale at the time.

6.      I introduced myself to the students manning the bake sale and commended them for their efforts. One student, who identified herself as a student government leader, introduced herself in response. As this individual is a minor, she will be referred to as KF.

- 1 -

Declaration of Jeff Worthley

RANDAZZA | LEGAL GROUP

7.     I informed KF that I would purchase some baked goods after I voted, as I did not want to take baked goods in the polling booth with me.  Were there no baked goods left, I indicated I would make a donation.  KF said that there may be none left, as not many people had followed through providing baked goods.

8.     I, as a City Councilor and civic-minded individual responded, relating my own experiences in student government, at that same high school, and sharing ideas about how to increase engagement and fundraising.  KF appeared delighted to hear the suggestions.

9.     KF expressed disappointment that she was unable to generate involvement from classmates, but she was beginning to survey students on the best ways to reach them.  I noted the impact of a handwritten note, much like the Drama Club's handwritten notes to all of the City Councilors, inviting them to performances. KF then offered me the phone number of her friend in the Drama Club, who wrote the notes, so I could thank her myself, but I declined to receive a phone number without consent.  I also declined KF's request that she give my number to the friend.

10.     After voting, I mentioned that the City Council President was interested in reinstituting "student government day" and KF expressed keen interest in that idea.

11.     I had been attempting to reach Superintendent Lummis (who never responded) about inspiring student volunteerism.  I then explained to KF that I was working on a volunteer project to clean up a local field, and that I had plans to create a volunteer corps in Gloucester, akin to a local version of the Peace Corps ("Gloucester Volunteer Corps").  Along with my 6th grade daughter and 8th grade son, I was able to generate sufficient interest to inspire 84 volunteers to help with a downtown clean-up event.  I had around 50 Gloucester citizens already involved

RANDAZZA | LEGAL GROUP

with my volunteer initiative. Apparently eager to network with a similarly civic-minded leader, KF expressed interest in the project, and asked me for my phone number.

12. As my number was already easily found on my public Facebook page, on the City's website, and on my City of Gloucester business cards, I gave her my number in lieu of her bothering to find it online in seconds.

13. KF then, unexpectedly and promptly, dialed my number and said "now you have my number too."

14. A true and correct copy of a screenshot of her call (with telephone number partially redacted) appears below:



15.     When I returned to my car, I saw that KF's call at 1:35 p.m. had come in from a number that my iPhone auto-identified as coming from KF's mother – as the iPhone draws from other information on the phone to suggest who the call may have been from.

16.     I then looked up the name on Facebook and saw that I was Facebook friends with KF's mother.

17.     I then responded to KF's overture at 1:49 p.m.

18.     Specifically, I dictated a text message, stating:

Hello [KF].  It was very nice meeting you today.  Good luck with the bake sale. I've been working on an idea to reinspire and reinvigorate volunteerism in our community.  My kids and I organize[d] a downtown cleanup event starting at Burnham's field back in September and we got 84 people to volunteer.  We organize[d] the painting of the rails and fencing around the mill pond and Mill River.  It is my belief that more people want to help but [sic] are currently helping; they just need to be invited.  And, also organized.  This idea I have draws from inspiration that John F. Kennedy had including the peace corps.  I'm not comparing myself to him but I want to create the Gloucester corps of volunteers.

And I think it starts with inspiring the next generation probably beginning as early as middle school.  There's a lot of steps to it.  And I don't have it figured out yet.  I just know it's needed and I want to put my focus and attention on this.

I'm not even sure what the total of my ask would be but I'd like to ask you if you would like to be involved in this movement I. [sic] At a minimum it would mean communicating to students and teachers at some point to help develop this.

19.     I, who had been a young a civic leader, was looking to engage the future civic leaders.  I, myself, first ran for Gloucester City Council at the age of 22.  I lost that first election, but I won two years later and again two years after that.  At age 28, I first ran for Mayor.

20.     KF responded later that evening at 9:30 p.m.:

Hi! Sorry for the late text but I wanted to be sure to get back to you.  It was great to meet you today too! Your plan sounds awesome.  At this time I wouldn't be able to respectfully dedicate myself to this movement, as I'm apart [sic] of a bunch of different clubs and boards through the school that take up a lot of my time.  I'd love to get bak to you and help out once things settle down for me.  Thank you so much and best of luck!

RANDAZZA | LEGAL GROUP

21.     I replied, assuaging KF's concerns about the late time of the text, noting that I would either be up late or my phone would be on silent—either way, the time she responded was of little concern.  Turning to the substance of the Gloucester Volunteer Corps idea, I indicated that I "wouldn't need [KF] to dedicate any time to this movement at this point" and that I wanted to consult "periodically" based on "what [her] schedule would allow".  I indicated I was looking for data and how to best communicate with other student leaders.  Of course, my idea for Gloucester Volunteer Corps could use leaders like KF, but as to KF herself, I indicated that I "completely understand" if she does not have the time and that I would pursue Gloucester Volunteer Corps "through the class advisors".

22.     True and correct copies of the foregoing messages are attached as **Exhibit B** to the Complaint.

23.     The next morning, KF's father called me to explain that KF was over-extended in her volunteer activities, and she would not be available to work on any of the outreach programs they discussed.

24.     I accepted KF's father's declination to participate on behalf of his daughter.  I told her father I would delete her number from my phone. I then summarized the discussion in a text message to KF's father, attached to the Complaint as **Exhibit C**.

25.     On November 14, 2022, at approximately 1:00 p.m., I received call from Gloucester City Attorney Suzanne Egan; I answered, assuming she was calling regarding legislative work. Egan insisted I come in for meeting at 2:30 p.m. with herself, Human Resources Director Holly Dougwillo, and Police Chief Ed Conley.

26.     I was told the meeting was in reference to my so-called "inappropriate communications with a female minor student."

27.     Of course, the communications were wholly proper constituent communications.

28.     At the meeting, I provided and read from the text messages.

29.     Chief Conley explicitly advised me that no crime had been committed and that I was not under investigation for a crime.

30.     Egan ambushed me with a "no trespass" letter, purportedly from Lummis, that was unsigned and during that meeting, Egan said that my proper communications with KF were somehow inappropriate, and that while my constituent communications with KF had violated neither a law nor any other rule, I was told that I was banned from coming on the Gloucester High School campus for the rest of the school year.

31.     Egan stated that the letter would not be sent by official means, because she said she wanted to keep it off city servers or out of city files, because then it would be a public record. It appeared clear to me that this is because she was trying to evade public records laws. I was confused about why a City Attorney would take such an action which appeared clearly calculated to evade public records laws.

32.     The letter grossly, maliciously, and knowingly mischaracterized and misrepresented the anodyne constituent communications between myself and KF.

33.     In response to my inquiring how the No Trespass Order could issue without an investigation, Chief Conley responded that I "may feel as though [my] due process rights have been violated, and I would likely agree with [him], but that this is a much better result than the alternative."

34.     There was no due process provided to me.  No notice.  No investigation.  No opportunity to be heard.  No opportunity to appeal.  Conley stated that the only way to change the outcome would be in the courts.

RANDAZZA | LEGAL GROUP

35.     I was also falsely informed that the matter was "private" and would not be disclosed to third parties.

36.     Later that evening, I emailed Egan for clarification about the letter; Egan responded with a signed version of the No Trespass letter, now on proper letterhead. Lummis had an opportunity to review the messages, yet still maintained his false, misleading, and retaliatory narrative.

37.     On November 14, 2022, Defendant Ben Lummis had issued a signed no trespass order ("No Trespass Order") against me that prohibits me from entering the Gloucester High School grounds or attending any school sponsored activities or events until the end of the 2022-2023 school year. The No Trespass Order is attached as **Exhibit D** to the Complaint.

38.     This No Trespass Order continues to maintain the knowingly false narrative that Lummis concocted in order to maximize the damage to me and to my reputation.

39.     Lummis falsely claimed that my discussions with KF "pose[d] a threat to the safety of the Gloucester High School community."

40.     I called Egan, and we spoke. I requested readily refused factual errors be corrected and that I wished to meet with Lummis about the matter.  I indicated that the No Trespass letter meant I would be unable to attend graduation day or watch my son play Taps on the coming Memorial Day (he had played it Memorial Day and Veteran's Day 2022).

41.     Shortly thereafter, Egan called me to tell me that Lummis refused to meet with me and there would be no exceptions.

42.     It is commonplace and expected that local politicians attend events at Gloucester High School. As a member of City Council, it is necessary that I have a working relationship with

RANDAZZA | LEGAL GROUP

Gloucester Public Schools and have the freedom to attend school sponsored events and activities.

I am now unable to do so.

43.     I have reviewed the facts and allegations in the accompanying Complaint, and I

have personal knowledge of them.  The facts and allegations therein are true and correct.

I declare under the penalties of perjury the foregoing is true and correct.

Dated: 11/23/22

Jeffrey T. Worthley

# **Exhibit B**

Text Messages Between
Worthley and KF

2:16 ◿

 10


KF



*iMessage*
Tuesday 1:49 PM

Hello ▉▉▉ It was very nice meeting you today. Good luck with the bake sale. I've been working on an idea to reinspire and reinvigorate volunteerism in our community. My kids and I organize a downtown cleanup event starting at Burnham's field back in September and we got 84 people to volunteer. We organize the painting of the rails and fencing around the mill pond and Mill River. It is my belief that more people want to help that are currently helping; they just need to be invited. And, also organized. This idea I have draws from inspiration that John F. Kennedy had including the peace corps. I'm not comparing myself to him but I want to create the Gloucester corps of volunteers.

And I think it starts with inspiring the next generation probably beginning as early as middle school. There's a lot of steps to it

  iMessage 

       

2:16



KF

that more people want to help that are currently helping; they just need to be invited. And, also organized. This idea I have draws from inspiration that John F. Kennedy had including the peace corps. I'm not comparing myself to him but I want to create the Gloucester corps of volunteers.

And I think it starts with inspiring the next generation probably beginning as early as middle school. There's a lot of steps to it and I don't have it figured out yet. I just know it's needed and I want to put my focus and attention on this.

I'm not even sure what the total of my ask would be but I'd like to ask you if you would like to be involved in this movement I. At a minimum it would mean communicating to students and teachers at some point to help develop this.

Tuesday 9:30 PM

Hi! Sorry for the late text but I

  iMessage 

       

2:16

10    

KF

Tuesday 9:30 PM

Hi! Sorry for the late text but I wanted to be sure to get back to you. It was great to meet you today too! Your plan sounds awesome. At this time I wouldn't be able to respectfully dedicate myself to this movement, as I'm apart of a bunch of different clubs and boards through the school that take up a lot of my time. I'd love to get back to you and help out once things settle down for me. Thank you so much and best of luck!

Thank you. This is definitely not too late. I wouldn't advise it but I was up until 4 am last nigh and at a meeting at 8 am. Not a good long term strategy but I'm either awake or my phone is on silent so it would never be a problem to text at any point.

I wouldn't need you to dedicate any time to this movement at this point. I just want to be able to consult with

iMessage

2:16 



KF

Thank you. This is definitely not too late. I wouldn't advise it but I was up until 4 am last nigh and at a meeting at 8 am. Not a good long term strategy but I'm either awake or my phone is on silent so it would never be a problem to text at any point.

I wouldn't need you to dedicate any time to this movement at this point. I just want to be able to consult with you periodically on best practices to survey students or to give me your best guess to how your peers might respond once I start developing this.

And at each point it would be based on what your schedule would allow and you can always say "can't now Jeff maybe next month" for example.

I'm going to need access to some data at some point and how best to communicate to students when the various points of contact need to

iMessage



point.

I wouldn't need you to dedicate any time to this movement at this point. I just want to be able to consult with you periodically on best practices to survey students or to give me your best guess to how your peers might respond once I start developing this.

And at each point it would be based on what your schedule would allow and you can always say "can't now Jeff maybe next month" for example.

I'm going to need access to some data at some point and how best to communicate to students when the various points of contact need to be made.

If you feel like even that is too much i completely understand and maybe I can work through the class advisors.

Delivered

# Exhibit C

Text Message From
Worthley to KF's Father

1:39

 16



Brandon ›

Brendan

Thank you for the call this morning.

My two children are at O'maley and I'm very sensitive to whoever talks to them.

I want to be completely clear that I will respect your request not to talk to contact ███

I am on the City Council and every year we appoint about 150 volunteers to serve on City boards and commissions. This year I took note that the average volunteer is in their 60's. I've been researching this and have learned that every non profit organization from the food pantry to HAWC is struggling to find volunteers. I've been working with teachers at O'maley to try to add some form of civics program and we are working on a more formal initiative to inspire volunteering.

iMessage



1:39

BF

Brandon

When I voted I had a conversation about a cakeless bake sale I held when I was ghs class President way back in the day because it was hard to get kids and their parents to bake. █████ told me about how hard it is to engage students and that she's often doing surveys. That's when I thought to share my idea about constituting a volunteer initiative inspired by JFK's creation of the peace corp. but for Gloucester.

█████ expressed her interest. She called me so she could have my phone number and I have hers and I specifically said I don't want there to be any confusion that me having her number is anything other than to add her to my volunteer list which I've attached for you. I also asked her to thank ██████████ from the drama club for sending hand written letters inviting us to each of the plays and musicals.

I completely respect that █████'s

iMessage

          



1:39

**BF**

Brandon

specifically said I don't want there to be any confusion that me having her number is anything other than to add her to my volunteer list which I've attached for you. I also asked her to thank ███████ from the drama club for sending hand written letters inviting us to each of the plays and musicals.

I completely respect that ██████ is too busy to help with this. I also will not have any contact with her unless it's through official channels with the schools.

I do appreciate you calling me and there's no need for any uncomfortableness or anything. And I have deleted her number from my phone and won't add her to my volunteer list. Your message was delivered clearly and effectively.

Respectfully,
Jeff Worthley

Read 11/9/22

iMessage













# Exhibit D

No Trespass Order
November 14, 2022



**The Gloucester Public Schools**
Ben Lummis
Superintendent
2 Blackburn Drive
Gloucester, MA 01930
Phone: 978-281-9800

November 14, 2022

Jeff Worthley

███████████████

### In Hand and Regular Mail

### NO TRESPASS ORDER

 This letter is delivered to officially notify you not to appear on or enter the premises of the Gloucester **High School during school hours or at any school sponsored event or activity from November 14, 2022 until the end of the 2022-2023 school year. You are hereby forbidden to attend any Gloucester High School events, enter or remain in or upon Gloucester High School buildings or surrounding grounds while school is in session or while a school sponsored event or activity is taking place.**

 This no trespass order and restriction is absolute and unconditional and is to continue to be in force and effective, regardless of whatever real or pretended reason, purpose, motive, intention or emergency you may have, pretend to have, or offer as an excuse for your entering, or wanting to enter, said premises.

 This notice is given under General Law c. 266, sec. 120 and among other things, provides that a person trespassing in violation of a notice such as this may be arrested immediately without a warrant. It has been concluded that it is in the public interest and safety and necessary for the protection of the Gloucester High School community to impose this restriction on you at this time.

 It has been reported to me that on November 8, 2022, while the Gloucester High School was used as a polling location, you approached a minor female student and used your official position as city councilor promising to assist her with her studies and extracurricular activities through your involvement in a school and city sponsored programs to obtain her personal cell phone number. You specifically targeted this female student and did not include the other students at the event, you did not seek the permission of an adult before obtaining the minor's telephone number, and you represented that you were involved in an official school or city program. Later that evening you communicated with her about your sleeping habits and other personal interests. When confronted by the female minor's parent, you misrepresented the facts and asserted that the student initiated the text communications. This behavior is not acceptable behavior. It poses a threat to the safety of the Gloucester High School community. You are therefore in accordance with said laws no longer welcome or allowed on the property outlined above.

 **You are hereby put on notice that as long as this Notification or any amendment remains in effect, if you choose to ignore same you may be subject to criminal trespass and other offenses as provided for by law and subject to arrest.** All other rights, claims and remedies of the School District are hereby reserved and not waived. The School District reserves the right to amend or modify this notice as is necessary

Ben Lummis
Superintendent
Gloucester Public Schools

Dated: _11/14/2022_

**OUR MISSION IS FOR ALL STUDENTS TO BE SUCCESSFUL, ENGAGED, LIFELONG LEARNERS**

# Exhibit E

Article
Gloucester Daily Times

https://www.gloucestertimes.com/news/councilor-says-hes-blindsided-by-no-trespass-order-at-gloucester-high/article_853dd4f0-69e7-11ed-a35b-073e75df57e4.html

# Councilor says he's blindsided by no-trespass order at Gloucester High

By Ethan Forman | Staff Writer
Nov 22, 2022





City Councilor at-Large Jeffrey T. Worthley

Kirk R.Williamson/File photo

Gloucester Public Schools last week ordered Councilor at-Large Jeff Worthley to stay away from Gloucester High, according to a statement from Superintendent Ben Lummis. But the reason for the order remains unknown.

"The Gloucester Public Schools, working with legal counsel, issued a no-trespass order to Jeff Worthley on Monday, November 14 for Gloucester High School," Lummis' statement reads. "While no student was ever in danger, I deemed this action in the best interests of the high school community. While I cannot say more about the particular circumstances, issuing a no-trespass order is a typical response for a school district to take in a situation like this one."

The statement continues, "The School Department will have nothing further to say about this matter to respect the privacy of the individuals involved."

At the same time, the City Council is scheduled to hold a closed-door meeting at 5:15 p.m. on Tuesday via Zoom "to discuss the reputation, character, physical condition or mental health, rather than professional competence, of an individual, or to discuss the discipline or dismissal of, or complaints or charges brought against, a public officer, employee, staff member or individual."

"Unfortunately, my lawyer instructed me to have no comment at this time about this illegal process," Worthley said Monday. "Otherwise, I wish I could present facts that completely exonerate me."

The reasons for the schools' no-trespass order and the City Council's executive session are not spelled out in the statement or agenda, respectively.

But Worthley's Gloucester attorney, Edward Pasquina Jr., said the

executive session revolves around the subject of the no-trespass order against Worthley.

However, Pasquina said he has a conflict with the timing of the meeting, as he has to appear with a client before the Shellfish Advisory Commission on another matter. He said late Monday afternoon he plans to write a letter to City Council President Valerie Gilman asking for a continuance.

**'A complete surprise'**"I'm asking for a more definitive statement," Pasquina said about the presumptions that led to the no-trespass order. He said he and his client have had a "great discussion" about what may have prompted it. He said it appears to have stemmed from circumstances at the time Worthley was at the high school voting in the Nov. 8 election.

"Any action he had was well-intended," Pasquina said. "And any action or intent he had was benign."

Pasquina said he has only seen a draft of the no-trespass order.

"The language that was contained in the no-trespass order that I saw that was unsigned was nebulous and did not speak to any wrongdoing," said Pasquina.

He said eventually he and his client will find out what led to the order, and that his client was surprised by it.

"He's as bewildered as I am," Pasquina said.

Pasquina said he's asking the city's general counsel, Suzanne Egan, for a more definitive statement.

"This came as a complete surprise to me since the superintendent didn't ask for any information from me before he reached his conclusion," Worthley said. "It's clear no crime has been committed, no intent to commit a crime, and I'm completely blindsided by this."

She added, "Student safety should be a top priority and since no crime was committed, no policy (was) violated and no inappropriate contact was made. I'm shocked that the superintendent reached this conclusion without contacting me. I'm committed to complete transparency."

**City mum on order**Through the city's public records request portal on Nov. 16, The Times sought a copy of the no-trespass order and correspondence between Egan and councilors.

The city's online response was that the request is under review "not available for the general public to view."

"The due date for your request may be later than usual because the office is closed on: November 24: Thanksgiving," the response reads.

The City Council agenda for its regular meeting Tuesday is scheduled to start at 6 p.m. on Zoom and it carries a "possible report of an executive session" at the end of the meeting.

Gilman said late last week she did not want to discuss publicly the reason for the executive session due to the need for confidentiality inherent in the process, to which she wanted to be true.

"I do not feel it's fair for the process to discuss why we have this executive session," she said. "It would be unfair for me to discuss the nature of the executive session."

She said whoever is the subject of the closed meeting "has a right to be heard."

Ethan Forman may be contacted at 978-675-2714,or at
eforman@northofboston.com.

---

Ethan Forman may be contacted at 978-675-2714,or at
eforman@northofboston.com.

Trending Video



| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts 2 The Superior Court |
|---|---|---|
| | | **COUNTY** Essex |

11/23/2022

| Plaintiff | Jeffrey T. Worthley | Defendant | School Committee of Gloucester |
|---|---|---|---|
| ADDRESS: | | ADDRESS: | The Gloucester Public Schools |
| | | | 2 Blackburn Drive, Gloucester, MA 01930 |
| | | | |
| **Plaintiff Attorney:** Marc J. Randazza | | **Defendant:** Ben Lummis | |
| ADDRESS: Randazza Legal Group, PLLC | | ADDRESS: The Gloucester Public Schools | |
| 30 Western Avenue, Gloucester, MA, 01930 | | 2 Blackburn Drive, Gloucester, MA 01930 | **RECEIVED** |
| | | | |
| BBO: 651477 | | | |
| **Plaintiff Attorney:** Jay M. Wolman | | **Defendant:** | |
| ADDRESS: Randazza Legal Group, PLLC | | ADDRESS: | |
| 30 Western Avenue, Gloucester, MA, 01930 | | | |
| | | | |
| BBO: 666053 | | | |
| **Plaintiff Attorney:** | | **Defendant:** | |
| ADDRESS: | | ADDRESS: | |
| | | | |
| | | | |
| BBO: | | | |
| **Plaintiff Attorney:** | | **Defendant:** | |
| ADDRESS: | | ADDRESS: | |
| | | | |
| | | | |
| BBO: | | | |
| **Plaintiff Attorney:** | | **Defendant:** | |
| ADDRESS: | | ADDRESS: | |
| | | | |
| | | | |
| BBO: | | | |
| **Plaintiff Attorney:** | | **Defendant Attorney:** | |
| ADDRESS: | | ADDRESS: | |
| | | | |
| | | | |
| BBO: | | BBO: | |

### TYPE OF ACTION AND TRACK DESIGNATION (see instructions section below)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| AB1 | Tortious Action Involving Commonwealth | A | ☒ YES   ☐ NO |

\*If "Other" please describe: _____

| Is there a claim under G.L. c. 93A? | Is there a class action under Mass. R. Civ. P. 23? |
|---|---|
| ☐ YES   ☒ NO | ☐ YES   ☒ NO |

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS

A. Documented medical expenses to date

    1. Total hospital expenses _____

    2. Total doctor expenses _____

    3. Total chiropractic expenses _____

    4. Total physical therapy expenses _____

5. Total other expenses (describe below)

|  |  |
|--|--|

Subtotal (1-5): $0.00

B. Documented lost wages and compensation to date

C. Documented property damages to date

D. Reasonably anticipated future medical and hospital expenses — TBD

E. Reasonably anticipated lost wages — TBD

F. Other documented items of damages (describe below) — TBD

|  |  |
|--|--|

TOTAL (A-F): $0.00

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

| Deprivation of constitutional rights, due process, emotional distress and other damages |
|--|

## CONTRACT CLAIMS

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|--------|-----------------------------------|--------|
| 1. |  |  |
|  | Total |  |

| Signature of Attorney/Unrepresented Plaintiff: X  /s/ Marc J. Randazza | Date: November 23, 2022 |
|--|--|

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

| |
|--|

## CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

| Signature of Attorney/Unrepresented Plaintiff: X  /s/ Marc J. Randazza | Date: November 23, 2022 |
|--|--|

# CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

### AC Actions Involving the State/Municipality *

AA1 Contract Action involving Commonwealth,
    Municipality, MBTA, etc. (A)
AB1 Tortious Action involving Commonwealth,
    Municipality, MBTA, etc. (A)
AC1 Real Property Action involving
    Commonwealth, Municipality, MBTA etc. (A)
AD1 Equity Action involving Commonwealth,
    Municipality, MBTA, etc. (A)
AE1 Administrative Action involving
    Commonwealth, Municipality, MBTA,etc. (A)

### CN Contract/Business Cases

A01 Services, Labor, and Materials (F)
A02 Goods Sold and Delivered (F)
A03 Commercial Paper (F)
A04 Employment Contract (F)
A05 Consumer Revolving Credit - M.R.C.P. 8.1 (F)
A06 Insurance Contract (F)
A08 Sale or Lease of Real Estate (F)
A12 Construction Dispute (A)
A14 Interpleader (F)
BA1 Governance, Conduct, Internal
    Affairs of Entities (A)
BA3 Liability of Shareholders, Directors,
    Officers, Partners, etc. (A)
BB1 Shareholder Derivative (A)
BB2 Securities Transactions (A)
BC1 Mergers, Consolidations, Sales of
    Assets, Issuance of Debt, Equity, etc. (A)
BD1 Intellectual Property (A)
BD2 Proprietary Information or Trade
    Secrets (A)
BG1 Financial Institutions/Funds (A)
BH1 Violation of Antitrust or Trade
    Regulation Laws (A)
A99 Other Contract/Business Action - Specify (F)

* Choose this case type if ANY party is the
Commonwealth, a municipality, the MBTA, or any
other governmental entity UNLESS your case is a
case type listed under Administrative Civil Actions
(AA).

† Choose this case type if ANY party is an
incarcerated party, UNLESS your case is a case
type listed under Administrative Civil Actions (AA)
or is a Prisoner Habeas Corpus case (E97).

### ER Equitable Remedies

D01 Specific Performance of a Contract (A)
D02 Reach and Apply (F)
D03 Injunction (F)
D04 Reform/ Cancel Instrument (F)
D05 Equitable Replevin (F)
D06 Contribution or Indemnification (F)
D07 Imposition of a Trust (A)
D08 Minority Shareholder's Suit (A)
D09 Interference in Contractual Relationship (F)
D10 Accounting (A)
D11 Enforcement of Restrictive Covenant (F)
D12 Dissolution of a Partnership (F)
D13 Declaratory Judgment, G.L. c. 231A (A)
D14 Dissolution of a Corporation (F)
D99 Other Equity Action (F)

### PA Civil Actions Involving Incarcerated Party †

PA1 Contract Action involving an
    Incarcerated Party (A)
PB1 Tortious Action involving an
    Incarcerated Party (A)
PC1 Real Property Action involving an
    Incarcerated Party (F)
PD1 Equity Action involving an
    Incarcerated Party (F)
PE1 Administrative Action involving an
    Incarcerated Party (F)

### TR Torts

B03 Motor Vehicle Negligence - Personal
    Injury/Property Damage (F)
B04 Other Negligence - Personal
    Injury/ Property Damage (F)
B05 Products Liability (A)
B06 Malpractice - Medical (A)
B07 Malpractice - Other (A)
B08 Wrongful Death - Non-medical (A)
B15 Defamation (A)
B19 Asbestos (A)
B20 Personal Injury - Slip & Fall (F)
B21 Environmental (F)
B22 Employment Discrimination (F)
BE1 Fraud, Business Torts, etc. (A)
B99 Other Tortious Action (F)

### RP Summary Process (Real Property)

S01 Summary Process - Residential (X)
S02 Summary Process - Commercial/
    Non-residential (F)

### RP Real Property

C01 Land Taking (F)
C02 Zoning Appeal, G.L. c. 40A (F)
C03 Dispute Concerning Title (F)
C04 Foreclosure of a Mortgage (X)
C05 Condominium Lien & Charges (X)
C99 Other Real Property Action (F)

### MC Miscellaneous Civil Actions

E18 Foreign Discovery Proceeding (X)
E97 Prisoner Habeas Corpus (X)
E22 Lottery Assignment, G.L. c. 10, § 28 (X)

### AB Abuse/Harassment Prevention

E15 Abuse Prevention Petition, G.L. c. 209A (X)
E21 Protection from Harassment, G.L. c. 258E(X)

### AA Administrative Civil Actions

E02 Appeal from Administrative Agency,
    G.L. c. 30A (X)
E03 Certiorari Action, G.L. c. 249, § 4 (X)
E05 Confirmation of Arbitration Awards (X)
E06 Mass Antitrust Act, G.L. c. 93, § 9 (A)
E07 Mass Antitrust Act, G.L. c. 93, § 8 (X)
E08 Appointment of a Receiver (X)
E09 Construction Surety Bond, G.L. c. 149,
    §§ 29, 29A (A)
E10 Summary Process Appeal (X)
E11 Worker's Compensation (X)
E16 Auto Surcharge Appeal (X)
E17 Civil Rights Act, G.L. c.12, § 11H (A)
E24 Appeal from District Court
    Commitment, G.L. c.123, § 9(b) (X)
E25 Pleural Registry (Asbestos cases)
E94 Forfeiture, G.L. c. 265, § 56 (X)
E95 Forfeiture, G.L. c. 94C, § 47 (F)
E99 Other Administrative Action (X)
Z01 Medical Malpractice - Tribunal only,
    G.L. c. 231, § 60B (F)
Z02 Appeal Bond Denial (X)

### SO Sex Offender Review

E12 SDP Commitment, G.L. c. 123A, § 12 (X)
E14 SDP Petition, G.L. c. 123A, § 9(b) (X)

### RC Restricted Civil Actions

E19 Sex Offender Registry, G.L. c. 6, § 178M (X)
E27 Minor Seeking Consent, G.L. c.112, § 12S(X)

**TRANSFER YOUR SELECTION TO THE FACE SHEET**

**EXAMPLE:**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES ☐ NO |

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF -** The plaintiff shall set forth, on the face of the civil action cover sheet (or attach additional sheets as necessary), a statement specifying the facts on which the plaintiff relies to determine money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served with the complaint. **A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.**

**DUTY OF THE DEFENDANT -** If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with his/her answer a statement specifying the potential damages which may result if the plaintiff prevails.

## A CIVIL COVER SHEET MUST BE FILED WITH EACH COMPLAINT.
## FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY
## MAY RESULT IN DISMISSAL OF THIS ACTION.