# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JEFFREY T. WORTHLEY, <br><br> Plaintiff, <br><br> v. <br><br> SCHOOL COMMITTEE OF GLOUCESTER; and BEN LUMMIS, in his official and personal capacities, <br><br> Defendants. | Civil Action No. 1:22-cv-12060 <br><br> **PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION[1]** |

A city councilor spoke to a constituent about a long-standing volunteer project. That is all Defendants relied on to issue an unconstitutional No Trespass Order. The opposition uses rhetoric like "targeting" and "inappropriate" and "dangerous" and "detail[ing] personal sleep habits"[2] to describe it. *See* ECF 17. The Court can read the communications at ECF 1-2 at 28-33.

Defendants allege Plaintiff was "soliciting a [high school student's] involvement in an *unofficial* volunteer group[.]" (Opp. at 3) (emphasis added). "Unofficial" is no different than the "volunteer" "student participation" welcomed by Clerk at the May 28, 2019, Council meeting. **Exhibit 1**.[3] Plaintiff attempted to contact Lummis for nearly a year regarding his project. Defendants are hostile to the idea as Lummis never returned his calls. ECF 1-2 at 21, ¶ 11.

---

[1] Prior to removal, the State Court denied the portion of the motion seeking *ex parte* emergency relief, though understanding the exigency of the relief sought it scheduled a hearing on short notice. Thus, what remains pending is that portion of the motion seeking a preliminary injunction. Prompt relief remains required.

[2] In this regard, K.F. wrote "Hi! Sorry for the late text…" and Worthley replied, "Thank you, this is definitely not too late. I wouldn't advise it but I was up until 4 am last nigh[sic] and at a meeting at 8 am. Not a good long term strategy but I'm either awake or my phone is on silent so it would never be a problem to text at any point." The imagination to transform this into something "inappropriate" should not be inside the mind of anyone who has access to children.

[3] https://gloucester-ma.gov/Archive/ViewFile/Item/10646

The Cook and Lummis Affidavits make it clear they discriminated against Plaintiff based on content and viewpoint.  It is probable that, in addition to the communications with K.F. that are constitutionally-protected speech, the No Trespass Order ("NTO") is retaliatory for Worthley's political statements.  Councilman Worthley has been vocal in resisting efforts to change Gloucester from working-class to a real estate agent's paradise. **Exhibit 2**.[4] *See also* **Exhibit 13** (Declaration of Jeffrey T. Worthley ("Worthley Decl.") at ¶ 3.  The NTO may have been the result of animus toward his volunteer program or part of a larger effort to discredit this anti-developer City Councilor.  Whatever the motivation, it was without due process, and Defendants' belated efforts are unavailing.  Further, Defendants downplay the breadth of the NTO, an extrajudicial injunction of its own.  But, it speaks for itself.  It prohibits:

1.  Entering or "appearing" on the premises of Gloucester High School (GHS);
2.  Entering or "appearing" at any school sponsored event;
3.  Entering or remaining in or upon any Gloucester High School building;  or
4.  Entering or remaining on any of the surrounding grounds; all
5.  While school is in session **or** while a school sponsored event or activity is taking place.

Notably, this whole NTO is the result (if we credit the Defendants' story) of an off-campus, non-school day text message exchange.  Yet, it says nothing about communicating with students.  That is, the NTO is not tailored to the "danger" of a politician communicating with a constituent.

The NTO is overbroad.  It prohibits Worthley from driving or walking the length of Leslie O'Johnson Road, which passes through the GHS parking lot. **Exhibit 3**.[5]  It prohibits him from

---

[4]  Baird, Gordon, "*Fishtown Local:  Why I write and fight",* Gloucester Daily Times (Dec. 25, 2022),https://www.gloucestertimes.com/opinion/fishtown-local-why-i-write-and-fight/article_2d6accd8-82bf-11ed-9dc6-83f80d808ef0.html
[5]   https://www.google.com/maps/place/Gloucester+High+School/@42.612717,-70.6752351,120m/data=!3m1!1e3!4m5!3m4!1s0x89e324e41c77c8ab:0x2f6c66e664613b3d!8m2!3d42.613403!4d-70.676198

using the open-to-the-public running track surrounding the GHS football field. **Exhibit 4**.[6] It prohibits him from even "appearing" at an event off GHS grounds, such as GHS hockey games, which take place at a facility nowhere near GHS. Worthley Decl. at ¶ 4. A perfunctory search of photos shared by City officials who routinely attend these types of events demonstrates how restrictive it is. Worthley Decl. at ¶¶ 5-10. The Charter itself provides for cooperation between City officials like Worthley and high school students. *See* Gloucester Charter § 2-7 "Student Government Day." ("Annually, a day known as 'Student Government Day' in the city shall be designated by the city clerk and by the school department who shall cooperate with each other in the programming and planning thereof." (Code 1970, § 2-13; Ord. of 7-24-1975, § 1). Worthley has been asked to work on this project by City Council President, Val Gilman. Worthley Decl. at ¶ 14. Worthley, as a Council member, is on the budget and finance committee. *Id.* at ¶15; **Exhibit 5**.[7] Worthley is tasked with appropriations for the school budget, but he is the only Council member prohibited from coming to GHS to inspect budgetary needs. *See* Worthley Decl. at ¶ 16.

The NTO is punishment for speaking to a class president about a civic volunteer program.[8] Defendants' evidence shows "she was honestly very interested." (ECF 17-1 at 9). Despite this, it she was confused as to Councilman Worthley's identity – and mistook him for Mayor Greg Verga.[9] ("[K.F.] is feeling very embarrassed and remorseful because she thought he was the Mayor"). *Id.* Defendants rely on an email from K.F.'s mother, claiming that "he immediately texted her back

---

[6] Curcuru, Nick, "*Rules for Using Newell*", Gloucester Daily Times (Aug. 28, 2014), https://www.gloucestertimes.com/sports/rules-for-using-newell/article_c1641842-2e4d-11e4-9ba7-0019bb2963f4.html

[7] https://gloucester-ma.gov/123/Standing-Committee-Documents

[8] The "sleep habits" issue is nonsense. Worthley was reassuring K.F. that the time of her text wasn't bothersome. If this were truly an issue, Defendants would have issued a No Trespass Order against every parent who can't reach their child, so texts the child's friend a message like "Hey Billy, can you tell Tommy to come home at 11? And tell him to be quiet—I'm going to bed."

[9] There is no indication Plaintiff ever misrepresented himself. In any event, it is immaterial—non-Mayors enjoy the same First Amendment rights as mayors.

not taking "no" for an answer." Meanwhile, the texts prove this false. K.F. wrote "I'd love to get back to you and help out once things settle down for me." A simple interpretation is that she could not do it now, but might later. Worthley responds to this interested constituent with what the project might entail, finishing with "If you feel like even that is too much I completely understand and maybe I can work through the class advisors." There was no danger. Worthley Decl. at ¶ 13.

Defendants suggest that Plaintiff must seek permission from Superintendent Lummis or Principal Cook to discuss volunteer work with students. (Opp. at 3 n2.). Defendants cite no authority. If true, it was negligent for Defendants to allow students to sell baked goods without adult supervision on Election Day. Meanwhile, there is a national movement to lower the voting age to 16. In fact, the Boston City Council approved a measure do just that. **Exhibit 6**.[10] Politicians speaking to future voters is not only constitutionally protected: a democratic society requires it. Worthley Decl. at ¶¶ 11-12. Defendants' issuance of a NTO against Plaintiff was unconstitutional. If K.F.,[11] or her parents, were troubled, there is a process for filing a police report or seeking a protective order. K.F. and her parents did neither. Nonetheless, Defendants acted extrajudicially.

## 1.0   LIKELIHOOD OF SUCCESS ON THE MERITS

### 1.1   The NTO Punishes Plaintiff's First Amendment Protected Speech

Defendants argue that they can arbitrarily issue a no trespass order under G.L. c. 266, § 120, without due process because they are not regulating speech. (Opp. at 7-8) They misapprehend

---

[10] Oscar Margain, *Boston City Council Approves Lower Voting Age to 16*, NECN, Nov. 30 2022, https://www.necn.com/news/politics/boston-city-council-approves-lowering-voting-age-to-16-pending-approval-from-wu-state/2880449/, (accessed Dec. 21, 2022). *See also* **Exhibit 7** "Beverly students push for lower voting age, SALEM NEWS, https://www.salemnews.com/news/local_news/beverly-students-push-for-lower-voting-age/article_d141545b-4f06-57f7-9ef8-7432f6d18ae0.html (noting that eight Massachusetts communities are considering lowering the voting age to 16).

[11] Plaintiff refers to the student as "K.F." consistent with the requirements of Fed. R. Civ. P. 5.2(a)(3). While the rule does not permit the redaction of the name of the parent who emailed the principal, Plaintiff does not object at this time, without prejudice to potentially having to utilize the parent's name later in the case, should, for instance, the parent not comply with a subpoena.

the holding in *Hurley v. Hinckley*, 304 F. Supp. 704 (D. Mass. 1969). In *Hurley*, there was a facial challenge to the statute. *Id.* at 709. The court held the statute was facially constitutional. *Id.* at 711. It does not follow that Defendants can issue a NTO against anyone for any reason, political or otherwise. (Opp. at 8). The *Hurley* court laid out the following First Amendment Principle:

> We are aware that permissible state regulation may not reach conduct intertwined with First Amendment freedoms of speech and petition, unless the actor or actors disrupt the uses to which the public has dedicated the property, or unreasonably interfere with the right of others to enter and leave the property.

*Id.* at 708. With respect to the second *Hurley* plaintiff, the court noted there was no evidence of any disruption by the plaintiff when she was distributing leaflets relating to welfare rights in a welfare office waiting room. *Id.* at 707 & 711. The court noted that there was a "strong argument to be made that plaintiff, in the circumstances described here, was upon public property 'with right' within the meaning of the trespass statute." *Id.* at 712. However, because the plaintiff waived an as-applied challenge, the court did not address the issue. *Id.*

Plaintiff does not challenge the facial constitutionality of the statute. Here, there was no due process and no constitutional basis for the order. Plaintiff disrupted nothing, nor is there an articulated fear that he might. Plaintiff did not violate any lawfully issued rule. None of the content of the communications was constitutionally impermissible. Plaintiff's speech was on a matter of civic volunteerism for the betterment of Gloucester, rendering it speech on a matter of public concern. Speech involves a matter of public concerns if it "can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" *Davignon v. Hodgson*, 524 F.3d 91, 101 (1st Cir. 2008) (*quoting Connick v. Myers*, 461 U.S. 138, 146 (1983)); *see also Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 986 (7th Cir. 2013) ("[I]f an objective of the speech was also to bring about change with public ramifications extending beyond the personal, then the speech does involve a matter of public concern.")

Defendants claim that there is no First Amendment right for Plaintiff to send text messages. (Opp. at 11) ("First, it is far from clear that plaintiffs conduct, in texting with a minor female high school student without her parents' permission, was constitutionally protected."). Yet, Defendants do not suggest a "reasonable time, place, or manner restriction[]", which is only "valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Here, there was no restriction—they invented an *ex post facto* rule, serving no governmental interest, let alone a significant one, and failing to leave open channels for a civic-minded individual to speak to potential volunteers and constituents. Instead, Defendants argue they can police speech on an *ad hoc* basis.

Defendants cite to the inapposite *Del Gallo v. Parent*, 545 F. Supp. 2d 162, 184 (D. Mass. 2008), *aff'd in part*, 557 F.3d 58 (1st Cir. 2008). (Opp. at 11) In *Del Gallo*, the post office had a regulation that specifically barred political campaigning on postal property. *Id.* at 173. Here, there was no regulation barring Plaintiff from communicating with a constituent. In fact, because there was a bake sale, communication with the students at the sale was *necessary*.

Defendants attempt to deflect and argue that the NTO was not about speech. The language of the Order is unequivocal (ECF 1-2 at 39). The Order was expressly issued because Plaintiff communicated with K.F. *Id.* Plaintiff violated neither law, nor rule, nor policy. It is an unconstitutional penalty for Plaintiff's speech.

### 1.2    The NTO was Issued Without Due Process

None of the three cases Defendants rely on to suggest Plaintiff was afforded due process support them. To the contrary, all of these cases are either mis-cited or support the Plaintiff. First, in *Wholey v. Tyrell,* the court recognized "a natural right to travel upon public property in his own

community." 567 F. Supp. 2d 279, 286 (D. Mass. 2008). Worthley agrees.  As discussed above, the Order denies Plaintiff the right to travel the road that passes through GHS property, much less attend events that politicians in Gloucester regularly attend. **Exhibit 8**.[12]

*Wholey* also holds that procedural due process requires notice and an opportunity to be heard. *Id.* (citing *Mard v. Town of Amherst*, 350 F.3d 184, 189 (1st Cir. 2003)).  In *Wholey*, the defendants provided both notice and opportunity.  They sent a temporary notice and their mind was not yet made up.  In *Wholey,* the defendant sought a meeting with notice before rendering a decision. *Id.* at 283.  The *Wholey* defendants explicitly set forth the issue: "the School Department felt [the plaintiff's conduct] presented a disruption to the school operation and threat to property, personnel and students," describing two incidents where the plaintiff violated a prior order.  *Id*.

In contrast, Plaintiff Worthley had no notice of anything.  He had no notice that there was a policy prohibiting contact between City Council members and GHS student government members, as there is no law, no rule, not even a custom restricting such contact.  In fact, there is a long tradition in Gloucester of just such contact — Student Government Day being but one example.  *See* **Exhibit 1**.[13]  Notably, Principal Cook endorsed the efforts of City Councilors "giving the students a broad view of the city's civic life" and looking to "expand the day in order to reach out to more students." *Id.* Plaintiff's communications aligned with the administration's stated goals.

Instead of notice, Worthley was  ambushed by the City Attorney who insisted he  had  to attend a "meeting."  He was not prepared for the accusations, and he had no idea what the meeting

---

[12] Forman, Ethan, "*GHS Graduates 'Feeling Good'",* Gloucester Daily Times (Jun. 12, 2022) available at https://www.gloucestertimes.com/news/ghs-graduates-feeling-good/article_1f0f6cb6-ea99-11ec-87af-9f2456c4a0d5.html

[13] Available at https://gloucester-ma.gov/Archive/ViewFile/Item/10646. *See also,* **Exhibit 9**, Lamont, Ray, "*Students Get an Inside Look at Government*", Gloucester Daily Times (May 27, 2019) available at https://www.gloucestertimes.com/news/local_news/students-get-an-inside-look-at-government/article_1b58688e-761a-5bfe-b114-e43c7985284d.html

was about until he entered the room.  Defendants try to characterize this as "due process" by arguing that Worthley had an "opportunity to explain his version of events."  (ECF 17 at ¶ 5).  If that was the due process to which Worthley was entitled, then what is the purpose of this "hearing" before the Assistant Superintendent that Defendants now want to hold?[14]

However, that newly-named "hearing" commenced with Worthley being presented with the pre-written Order.  Lummis admitted that he had decided to issue the Order (ECF 17-1 at ¶¶ 14-17) — there was no "opportunity".  If Worthley had any notice that this was to be a punitive hearing, he would have attended with counsel, and he would have recorded the proceedings.  The Chief of Police stated to Worthley that he understood that he was being deprived of due process and where he was threatened that "the alternative would be much worse." ECF 1-2 at 25, ¶¶ 29-34.  The Defendants apparently deny that this happened, ECF 16 at ¶ 38, but notably, Chief Conley has not provided a declaration, nor anyone else present.  Accordingly, Worthley's version of the events must be credited.  Thus, unlike in *Wholey*, Plaintiff was denied due process.

Second, in *Collins v. Univ. of N.H.*, the plaintiff was charged with stalking and disorderly conduct.  664 F.3d 8, 10 (1st Cir. 2011).  He was informed of the claims and invited "to explain in writing why the ban should be lifted."  *Id.* at 12.  The court recognized due process required "an individual be given an opportunity for a hearing before he is deprived of any significant property interest."  *Id.* at 16.  As the University had suspended him with pay, there was no deprivation of a property interest.  Here, however, the so-called "hearing" the Defendants describe cannot in any way be characterized as being "fully informed of the claims against him."  In fact, those *claims* are still unclear.  And, unlike in *Collins,* where the plaintiff was not deprived of a

---

[14] Defendants assert that Plaintiff has refused to attend a *post hoc* hearing.  In actuality, Defendants alternately characterized it as a "meeting" and a "hearing", and Plaintiff indicated that he is willing to have a meeting, but raised concerns as to the validity of the novel "hearing".  *See* **Exhibit 10** and **Exhibit 11**.

liberty interest because he was "given multiple opportunities to be heard in writing and in person," amounting to adequate process, Defendants afforded Worthley no adequate process. *Id.* at 18.

Finally, in *Price v. Mount Wachusett Cmty. Coll.*, there were multiple complaints from "many" employees who Price harassed. 2012 U.S. Dist. LEXIS 118185, at *4 (D. Mass. Feb. 17, 2012). Price was unable to identify a property or liberty interest warranting due process. In contrast, a prohibition from town property and community events deprives Worthley's liberty interests, requiring due process. *Melville v. Town of Adams*, 9 F. Supp. 3d 77, 106 (D. Mass. 2014).

Defendants also rely on *Lowe v. Scott*, 959 F.2d 323 (1st Cir. 1992), to contend if a state provides adequate post-deprivation remedies – either by statute or through common law tort remedies available in its courts – no claim of a violation of procedural due process can be brought. However, it only addresses unconstitutional conduct that is "random and unauthorized," not where the chief administrator, who holds the authority, commits the deprivation. 959 F.2d at 344. The NTO was not issued by a subordinate whose actions could not be anticipated—it was issued by the Superintendent, who answers to no other person. Defendants do not argue Lummis lacked this authority; to the contrary, they rely on it. Thus, Worthley was denied due process.

### 1.3    Plaintiff has a Likelihood of Success on his State Law Claims

Defendant Lummis fares no better under the state law claims than he does under Section 1983.[15]  First, Defendants make no real argument as to due process distinct from their Section 1983 arguments.  There was no "post-deprivation hearing" that is adequate—it is an *ad hoc* process they invented only because they were sued.  The problems with that "process" are rife as explained

---

[15] Case law suggests the municipality is not a "person" under the MCRA.  However, the SJC has inconsistently acknowledged that it can be a "person" for other purposes.  *See Spence v. Bos. Edison Co.*, 390 Mass. 604, 609-10, 459 N.E.2d 80, 84 (1983).  It cannot be simultaneously a person and not a person under the same definition.  Thus, while the claim is valid, Plaintiff recognizes he has a low likelihood of success on the state law claim against the municipality.

in

Plaintiff's response letter, **Exhibit 11**.

Second, the claim that there is no interference with Worthley's rights by means of "threats, intimidation or coercion" is risible.  He can be grabbed, handcuffed, and thrown in prison, all by the lawful use of force, should he set one foot on GHS grounds.  It is well recognized that threatening a plaintiff "that they would be arrested if they did not vacate property, and pressing the police to arrest [] plaintiffs for being on property, satisfies requirement of threats, intimidation or coercion." *Arias v. City of Everett*, No. 19-10537-JGD, 2019 U.S. Dist. LEXIS 209532, at *18 (D. Mass. Dec. 4, 2019); accord *Reproductive Rights Network v. President of the Univ. of Mass.*, 45 Mass. App. Ct. 495, 508 (1998) (university's threat of arrest for trespass, student access to a campus building for the purpose of engaging in protected political activity, was "threats, intimidation, or coercion" under the MCRA).  Moreover, the Police Chief's threat that worse would happen should Worthley seek due process cannot be ignored.

## 2.0    CONCLUSION

The Court should enjoin the Defendants from infringing Worthley's constitutional rights. The court should enjoin Defendants from enforcing the no trespass order against Plaintiff during the 2022-2023 school year and permit Plaintiff to enter upon the premises of Gloucester Public Schools during school hours, along with attending school sponsored events and activities.

Dated: December 28, 2022.          Respectfully Submitted,

/s/ Marc J. Randazza
Marc J. Randazza, BBO# 651477
Jay M. Wolman, BBO# 666053
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (978) 801-1776
ecf@randazza.com

Attorneys for Plaintiff
Jeffrey T. Worthley

Case No. 1:22-cv-12060

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on December 28, 2022,  I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I further certify that a true and correct copy of the foregoing document being served via transmission of Notices of Electronic Filing generated by CM/ECF.

<u>/s/ Marc J. Randazza</u>
Marc J. Randazza

# **<u>Exhibit 1</u>**

Gloucester City Council
Meeting Minutes
May 28, 2019

**GLOUCESTER CITY COUNCIL MEETING**
Tuesday, May 28, 2019 – 7:00 p.m.
Kyrouz Auditorium – City Hall
-MINUTES-

**Present:  Chair, Councilor Paul Lundberg; Vice Chair, Councilor Steven LeBlanc, Jr.; Councilor Valerie Gilman; Councilor Kenneth Hecht; Councilor Jennifer Holmgren; Councilor Scott Memhard; Councilor Sean Nolan; Councilor James O'Hara**
**Absent: Councilor Cox**
**Also Present:  Mayor Theken; Joanne Senos; Jim Destino; Kenny Costa; Chip Payson; John Dunn; Dr. Richard Safier; Fire Chief Eric Smith; Police Chief Edward Conley, III; Harbormaster T.J. Ciarametaro; Jonathan Pope; Jill Cahill; Joel Favazza; Kathy Clancy; Vanessa Krawczyk**

     **The meeting was called to order at 7:00 p.m.  The Council President announced that this meeting is recorded by video and audio in accordance with state Open Meeting Law.**

**Flag Salute led by Gloucester High School Student Government Day participants and the National Anthem sung by GHS Senior, Sadie Cook**
Student Government Day Presentation:

     **Council President Lundberg** announced that today was Student Government Day in the City of Gloucester, and read City Charter Sec. 2-7:"Annually, a day known as "Student Government Day" in the city shall be designated by the city clerk and by the school department who shall cooperate with each other in the programming and planning thereof."  Noting that it had been a while since the last Student Government Day, he thanked the participants -- students and mentors alike.  He highlighted that the day was organized by Councilors Gilman and Holmgren; Rich Francis, GHS History Teacher; James Cook, GHS Principal; Dr. Richard Safier, Superintendent of Schools; and City Clerk, Joanne Senos.
     **Mayor Sefatia Theken** conveyed her thanks for reinvigorated Student Government Day, noting she had two students with her for the morning and two more students in the afternoon.  She mentioned the Managers Meeting that took place in the morning which many student participants attended with their department head mentors.  She noted other activities her students participated in, highlighting a tourism group visit to the city and a trip to the Visitor's Center at Stage Fort Park.  She recounted how she and CAO, Jim Destino who had two students of his own sat down together in her office for a round-table discussion.  She offered several suggestions for next year's Student Government Day and expressed appreciation for the students' civic engagement and their knowledge base.  **Council President Lundberg** thanked the Mayor for her commitment to Student Government Day and to the Cape Ann League of Women Voters of Gloucester, naming Nan Andrew, Christy Park, Cynthia Bjorlie, June Michaels and Jan Bell for their participation as partners and their assistance.
     **Dr. Richard Safier** added his "special" thanks to the participating students, the mentors and Councilors Gilman and Holmgren for their guidance of the program and to GHS Principal Cook and GHS History Teacher, Rich Francis.  He mentioned that since June 2018 the development of a state framework for civic participation programming for students Pre-K through 12 is underway, pointing out how that educational programming would sync well with Student Government Day.  He conveyed that the city's Student Government Day could be a cumulative project for this new forthcoming mandated civics education framework.
     **James Cook,** GHS Principal, mentioned his thanks to the Council for the reconstituted Student Government Day, especially thanking Councilors Gilman and Holmgren for their efforts. He highlighted that in Gloucester it's always been important to look to the past as a foundation, and that organizing this day gained from those experiences as well as looking forward to needs of students today.  This day enabled the exposure for students to have wide range of experiences -- from the Fire Department to the Mayor's Office, seeing what makes a city works thereby giving the students a broad view of the city's civic life.  He mentioned partnerships and the challenges of logistics to make something like Student Government Day work.  He noted this is just the beginning, with many ideas to expand the day in order to reach out to more students, but also bringing that learning experience to all GHS students studying government.
     **Rich Francis,** GHS History Teacher and lead faculty member organizer, touched on certain amendments to the U.S. Constitution, pointing out that there are a lot people who don't know about how their government works.  By bringing back Student Government Day they're showing their future voting citizens how their government works by showing transparency.  This is the start of what they can do with civics in the schools' classroom, he exclaimed.

They need to give the students tools to become informed voters, he highlighted; they need for students to be interested in government to be able to become active citizens. He pointed out that they want a well-rounded activist citizenry to be able to know how to watch and what to watch for in their government. This day gets the ball rolling, he noted, saying that civics is very important. "An educated citizenry is a vital requisite for our survival as a free people" he quoted.

**Council President Lundberg** noted the presence of **State Sen. Bruce Tarr** who came to the podium and spoke to the enthusiasm of GHS teacher, Rich Francis. He expressed thanks to Dr. Richard Safier, and Principal Cook, as well as the Council, especially Councilors Gilman and Holmgren, for organizing today's events. He mentioned his brother, Brian Tarr, was a former participant of Student Government Day as "Mayor" and went on to have a long, rewarding career with the city. He reported the Senate FY2020 budget created a Trust Fund to provide the financial resources for t civics education that will be mandated statewide. Gloucester, he pointed out, is once again on the cutting edge, leading the way.

**Student Participants:**

**Kennedy Rounds,** reported she was a student participant with Mayor Theken. **Graci O'Toole** and **Willow Phoenix**, reported their shadowing experience with the Mayor recounting speaking to her about her job; learning about government officials' roles, and offered thanks for the opportunity to participate.

**Police Chief Ed Conley, III,** reported he was a participant in the late 1980's in Chelsea's Student Government Day, and, he, too, shadowed a Mayor. He advised that was how he began to learn about the meaning of government. He touched on his students' experiences at the Police Station and the District Court. He expressed his gratitude that he had two young women (**Serena Ferrara** and **Vanessa Linquata**) who joined him at the station, saying that it was a great opportunity to talk about what it is to really be a policeman. He mentioned that both young women expressed an interest in entering the profession.

**Fire Chief Eric Smith** recounted his experiences with **Kiley Jackson** and **Brittney Anderson** which started with Roll Call, and then delved into in-house procedures and on to giving them a full view of how a fire service operates as well understanding the goals of the organization.

**Emmett Caldwell**, was paired with **Karin Carroll**, Public Health Director, **Councilor Gilman** noted.

**Jill Cahill**, Community Development Director, conveyed that the most interesting fact of her student participant was her expressing she was "very nosey and wanted to know about everything that was going on" saying that was why she chose the Community Development Department. She mentioned taking her student through all the ways the department is involved in public community processes at different levels of government.

**Cara Buchannan** was partnered with **Deborah Kelsey**, Library Director, **Councilor Gilman** reported.

**Andrew Topouzoglou** and **Jordan Perrine** were partnered with **Harbormaster T.J. Ciarametaro**, who recounted his experiences with the two students, one of whom liked being on the water, and the other who was interested in becoming a member of the Environmental Police and joining the U.S. Coast Guard. He noted he introduced his two students to the Shellfish Constable and then had an in-depth discussion on the work of the Harbormaster's Department and how they work in conjunction with the rest of city departments and other governmental entities.

**Ky O'Neil**, was partnered with City Auditor, **Kenny Costa**. **Mr. Costa** recounted his experience with his student who was in City Hall for the very first time saying he reviewed some of his reporting responsibilities and how bills are paid for the city. She gained an appreciation for the checks and balances of the city's finances, he added.

**Cassidy Briere**, **Makayla Cruz** and **Megan Gallo** were paired with Cynthia Bjorlie of the League of Women Voters and Melissa Teixeira Prince of the Gloucester District Court, also a School Committee Member. **Ms. Cole**, recounted her experiences briefly for the Council. **Ms. Prince** expressed her full support for Student Government Day mentioning how impactful the day was for the students, hers in particular. She expressed how pleased she was that one of her student participants wants to be a teacher one day.

**Council President Lundberg** acknowledged the presence of members of the School Committee: Chair, **Jonathan Pope; Melissa Teixeira Prince; Kathy Clancy**; and **Joel Favazza**.

**Councilor Jen Holmgren**, and student **Kyle Watts** recounted that they toured the Archives Department and discussed Council processes. **Councilor Holmgren** noted how smart and patient her student was, and expressed her appreciation to Councilor Gilman for reviving Student Government Day.

**Kevyn Anne Chandler** was paired with **Council President Lundberg** who mentioned he and his student did the same activities as Councilor Holmgren.

**Lilly Marshall** was paired with **Councilor Jamie O'Hara**. She touched on highlights of her tour of the DPW and speaking with Mike Hale, Public Works Director and his staff, learning about the issues they face. She expressed thanks for her experience with Student Government Day.

**Danielle Denman** and **Lauren Alves** were partnered with **Jim Destino**, CAO.  **Mr. Destino** expressed that he enjoyed his time with his two students and described how he conveyed information about city government and all its processes. He noted they listened intently, and asked some great questions, expressing their concern about climate change in particular.  He recounted for his students the initiatives the city is undertaking now and how they're working to plan for climate change and sea rise.   He expressed that this was a great day, thanking everyone involved.

**Ethan Uhlig** was paired with School Committee Chair, **Kathy Clancy** who took her student to an MSBA Building Committee meeting and on a tour of the new West Parish Elementary School.

**Marissa Neves** was noted as partnered with **Mike Hale**, DPW Director.

**Lawrence Scola** was paired with **Councilor Gilman**.  **Mr. Scola** recounted his tour with Councilor Gilman of City Hall capped by a visit to the top of the bell tower; and learned how the City Council meetings work as well as how ordinances are created.

**Councilor Gilman** expressed her thanks for the support of the Administration, particularly Mayor Theken and the City Council.

**Joanne Senos**, City Clerk, one of the organizers of the 2019 Student Government Day, recounted that while her department had no student participants, mentioned that the City Clerk's office would welcome student participation during the 2019 fall preliminary and municipal election as volunteers in order to experience civics in action, truly government in action.

**Councilor Gilman** concluded the presentation on Student Government day by showing a brief video collage of photographs from Student Government Day 2019.

**By a unanimous vote of the Council, Student Government Day 2019 was declared an unqualified success.**

**Oral Communications:  None.**
**Confirmation of New Appointments**:  None.
**Consent Agenda:**
- *CONFIRMATION OF REAPPOINTMENTS*

| | | |
|---|---|---|
| 1. Gloucester Housing Authority | Dorothy Martins | TTE 05/28/24 |

- *MAYOR'S REPORT*

1. New Appointments:

| | | | |
|---|---|---|---|
| | Clean City Commission | Dimitra Lavrakas (to an fill unexpired term) TTE 02/14/2020 | (Refer O&A) |

2. Memorandum from Shellfish Constable re: request amendment to GCO Ch. 20 "Shellfish, Seaworms and Eels" Sec. 4 "Areas set aside for noncommercial taking of shellfish — (Refer B&F)
3. Memorandum from Veterans Services Director re: request acceptance of donations totaling $210 — (Refer B&F)
4. Memorandum, Grant Application & Checklist from the Director of Public re: request acceptance of a MDS Foundation Grant in the amount of $1,980 — (Refer B&F)
5. Memorandum from CFO re: requesting creation of a new General Capital Project fund from remaining cash balances for school building interior/exterior door replacement — (Refer B&F)
6. Memorandum from CFO re: loan authorization request in the amount of $1,800,000 for funding to replace 6,000 feet of water main Along Englewood Road and abutting streets in Magnolia — (Refer B&F)

- *COMMUNICATIONS/INVITATIONS*

1. Invitation from the Gloucester Fire Department Relief Association to the Firefighters' Memorial Service on June 9, 2019 — (Info Only)

- *INFORMATION ONLY*
- *APPLICATIONS/PETITIONS*
- *COUNCILORS ORDERS*

1. CC2019-022 (Memhard):  Amend GCO Ch. 22 "Traffic and Motor Vehicles", Sec. 22-270 "Parking prohibited at all times" and Sec. 22-291 "Tow-away zones" re: Rackliffe Street — (Refer O&A & TC)

- *APPROVAL OF MINUTES FROM PREVIOUS COUNCIL AND STANDING COMMITTEE MEETINGS*

1. City Council Meeting: 05/14/2019 — (Approve/File)
2. Standing Committee Meetings:  B&F 05/23/2019, O&A 05/20/2019, P&D 05/22/2019 — (Approve/File)

**Unanimous Consent Calendar:**
1. Addendum to the Mayor's Report:  Request approval for the Recreational Trails Program Grant in the amount of $49,000 for the Gloucester Watershed & Open Space Public Access Upgrades — (Refer B&F)

**Items to be added/deleted from the Consent Agenda & Unanimous Consent Calendar:**

**By unanimous consent of the Council, the Consent Agenda and Unanimous Consent Calendar was accepted as presented.**

**Committee Reports:**

**Budget & Finance:  May 23**

COMMITTEE RECOMMENDATION:  On motion by Councilor Hecht, seconded by Councilor Memhard, the Budget & Finance Committee voted 2 in favor, 0 opposed, 1 (Cox) absent, to recommend that the City Council accept under MGL c. 44, §53A, a private grant for $20,000 for FY19 Beth Israel-Lahey Health Beverly & Addison Gilbert 2019 Community Collaborative Grant Regional Senior Transportation Program for the purpose of a regional senior transportation program for the communities of Gloucester, Rockport, Essex and Manchester-by-the-Sea.  The purpose for this grant is to expand existing transportation systems to include trips to grocery stores, the Farmer's Market and the Food Pantry as well as to Gloucester's Stacy Boulevard and trails/recreation areas throughout Cape Ann.  Grant funds must be expended by December 31, 2019. There is no local match for this grant.

**DISCUSSION:**

Councilor Memhard reported this is a pilot program motion that the Public Health Director is pleased to present for the city, and is looking forward to working through Beth Israel-Lahey Health through Beverly and Addison Gilbert Hospitals.

**MOTION:  On motion by Councilor Memhard, seconded by Councilor Hecht, the City Council voted 8 in favor, 0 opposed, 1 (Cox) absent, to accept under MGL c. 44, §53A, a private grant for $20,000 for FY19 Beth Israel-Lahey Health Beverly & Addison Gilbert 2019 Community Collaborative Grant Regional Senior Transportation Program for the purpose of a regional senior transportation program for the communities of Gloucester, Rockport, Essex and Manchester-by-the-Sea.  The purpose for this grant is to expand existing transportation systems to include trips to grocery stores, the Farmer's Market and the Food Pantry as well as to Gloucester's Stacy Boulevard and trails/recreation areas throughout Cape Ann.  Grant funds must be expended by December 31, 2019. There is no local match for this grant.**

COMMITTEE RECOMMENDATION:  On a motion by Councilor Hecht, seconded by Councilor Memhard, the Budget & Finance Committee voted 2 in favor, 0 opposed, 1 (Cox) absent, to recommend that the City Council accept under MGL c. 44, §53A, a cash donation in the amount of $2,000 from the Minogue Family Foundation to be used to benefit the on-going efforts of the Harbormaster's Department.

**DISCUSSION:**

Councilor Memhard noted that this is a generous donation the Council was pleased to accept on behalf of the city, and that the Harbormaster has duly recognized the contribution

**MOTION:  On a motion by Councilor Memhard, seconded by Councilor Hecht, the City Council voted 8 in favor, 0 opposed, 1 (Cox) absent, to accept under MGL c. 44, §53A, a cash donation in the amount of $2,000 from the Minogue Family Foundation to be used to benefit the on-going efforts of the Harbormaster's Department.**

COMMITTEE RECOMMENDATION:  On a motion by Councilor Hecht, seconded by Councilor Memhard, the Budget & Finance Committee voted 2 in favor, 0 opposed, 1 (Cox) absent, to recommend that the City Council approve Special Budgetary Transfer 2019-SBT-10 in the amount of $20,000 from Account #600052-558000, Water OM Other Supplies to Account #600051-513002, Water PS Overtime - Labor, for the purpose of funding overtime costs for Water Department personnel to work at Wallace, Haskell and Goose Cove Reservoirs to put in place the Dam Vegetation.

**DISCUSSION:  None.**

**MOTION:  On a motion by Councilor Memhard seconded by Councilor Hecht, the City Council voted 8 in favor, 0 opposed, 1 (Cox) absent, to approve Special Budgetary Transfer 2019-SBT-10 in the amount of $20,000 from Account #600052-558000, Water OM Other Supplies to Account #600051-513002, Water PS Overtime - Labor, for the purpose of funding overtime costs for Water Department personnel to work at Wallace, Haskell and Goose Cove Reservoirs to put in place the Dam Vegetation.**

COMMITTEE RECOMMENDATION:  On a motion by Councilor Hecht, seconded by Councilor Memhard, the Budget & Finance Committee voted 2 in favor, 0 opposed,  1 (Cox) absent, to recommend that the City Council approve Supplemental Appropriation 2019-SA-35 in the amount of $10,000 (Ten Thousand Dollars) from the Capital Projects Stabilization Fund-Undesignated Fund Balance,  Account #7600-359000, to Sail GHS Float Repairs CP Stabilization – Site Improvements, Account #760024-584000 for the purpose of funding repairs to the Sail GHS float system located in the inner harbor.

**DISCUSSION:**

    **Councilor Memhard** advised that the Harbormaster's Department did a careful study of the situation, and reported that this expenditure to rehabilitate the sailing center floats, that have a value of over $100,000, in the city's inner harbor take a "beating."  The repairs will extend the useful life of the floats, with offsetting funds from other private donations, he added.
    **Councilor Gilman** offered her support for the Supplemental Appropriation, saying that her son benefitted from participating in the Sail GHS program when he was a student at the O'Maley Innovation Middle School, saying that this appropriation helps to support this great school program.  She extended her thanks to the Administration.

**MOTION:  On a motion by Councilor Memhard, seconded by Councilor Hecht, the City Council voted by ROLL CALL 8 in favor, 0 opposed, 1 (Cox) absent, to approve Supplemental Appropriation 2019-SA-35 in the amount of $10,000 (Ten Thousand Dollars) from the Capital Projects Stabilization Fund-Undesignated Fund Balance,  Account #7600-359000, to Sail GHS Float Repairs CP Stabilization – Site Improvements, Account #760024-584000 for the purpose of funding repairs to the Sail GHS float system located in the inner harbor.**

COMMITTEE RECOMMENDATION:  On a motion by Councilor Hecht, seconded by Councilor Memhard, the Budget & Finance Committee voted 2 in favor, 0 opposed, 1 (Cox) absent, to recommend that the City Council approve Supplemental Appropriation 2019-SA-36 in the amount of $37,000.00 (Thirty Seven Thousand Dollars) from Capital Projects Stabilization Fund-Undesignated Fund Balance, Account #7600-359000, to Nissan Leaf Purchase CP Stabilization, Vehicles Account #760015-585001 for the purpose of funding the purchase of three 2016 Nissan Leaf vehicles per the purchase option included in the underlying lease agreements with Nissan Motors.

**DISCUSSION:**

    **Councilor Memhard** remarked that at this time the three 2016 Nissan Leafs that are at the end of their lease term, and the city has the option to purchase them.  The total cost for the city is about 40% of the sticker price with each vehicle having relatively low mileage.  He recounted that last year the city had purchased three 2015 Nissan Leafs that were coming off their three-year lease term.  These vehicles are electric, cost efficient and economical for in-city staff travel.

**MOTION:  On a motion by Councilor Memhard, seconded by Councilor Hecht, the City Council voted by ROLL CALL 8 in favor, 0 opposed, 1 (Cox) absent, to approve Supplemental Appropriation 2019-SA-36 in the amount of $37,000.00 (Thirty Seven Thousand Dollars) from Capital Projects Stabilization Fund-Undesignated Fund Balance, Account #7600-359000, to Nissan Leaf Purchase CP Stabilization, Vehicles Account #760015-585001 for the purpose of funding the purchase of three 2016 Nissan Leaf vehicles per the purchase option included in the underlying lease agreements with Nissan Motors.**

COMMITTEE RECOMMENDATION:  On a motion by Councilor Hecht, seconded by Councilor Memhard, the Budget & Finance Committee voted 2 in favor, 0 opposed, 1 (Cox) absent, to recommend that the City Council in accordance with GCO Sec. 16-1 permit the Planning Division of Community Development to  apply for a Municipal Vulnerability Preparedness Grant (MVP) through the MA Executive Office of Energy and Environmental Affairs for a grant total of $2,000,000 to build out a Gloucester High School Flood Barrier in order for the protection of the GHS campus.  The grant requires a minimum local cash match of 25% that will be identified through a loan authorization request.

**DISCUSSION:**

**Councilor Memhard** advised that the Planning Division is moving aggressively on this matter, saying it is hoped the city will be awarded the grant they've applied for.  This is an after-the-fact request to permit a grant application with a match due to time sequencing to the grantor and the FY20 budget review schedule.  At the next City Council meeting, the grant match, a $2 million loan authorization will come forward.  Mr. Destino had indicated that if the grant is not forthcoming, and notice is expected in June, that the city wouldn't move ahead with the project.  If the grant funding of $2 million is awarded, it would be put against the final total amount that the city would put out to long-term debt, which would bring the city's portion to $1.15 million rather than the full $3.15 million.

**Councilor Gilman** asked how this project would work in terms of its structure.  **Mr. Destino** pointed out there has been discussion about sea level rise and climate change and how to best use city resources.  Through Community Development and the Planning Division a lot of work has been done on Municipal Preparedness Program; work to lift sewer pumping stations.  He pointed out that one of the biggest concerns is the protection of the High School property and its facilities.  He noted it is a very valuable asset, that to replace it would be hundreds of millions of dollars.  He announced that the time is right by leveraging this grant funding to build a flood barrier which will start at the building's science wing on the canal.  The barrier will be about as high as the fencing of the softball field in certain spots and go all the way to the Blynman Bridge and taper down as it goes along.  It will be a steel structure with landscaping for aesthetics.  From the fence to the granite seawall there will be a walking path.  There will be a flood barrier causing some visual disruption of views but it is the best way to keep the life of the high school going for another 50 years without loss of this valuable asset because of storm events.  This will also protect the stadium facility as well.  This is but one step, he indicated, saying that they'll "pick their spots" where they think they can add the most value with tax dollars.  They'll know by June 30th about the grant funding.  Councilor LeBlanc will be hosting a meeting at the High School Auditorium on June 3 for constituents who will be affected by this project, getting their input, and anticipate having better visuals by the time of the meeting for the public to view.  It is a flood barrier, not a "wall."  **Councilor Memhard** raised the issue of ground water and rising tides which in turn raises ground water levels, he noted, and as such, they're having their engineer investigate that possibility and possible remedies if necessary.   He assured that further information will be available at the public hearing for a loan order.

**Councilor LeBlanc** announced the public meeting about the flood barrier for the GHS campus is taking place on Monday, June 3rd at 6:00 p.m. in the High School Auditorium.  He mentioned working with the Mayor and Community Development's Planning Division on this meeting.  An electronic sign at the high school will advertise the meeting also, he noted.

**MOTION:  On a motion by Councilor Memhard, seconded by Councilor Hecht, the City Council voted 8 in favor, 0 opposed, 1 (Cox) absent, in accordance with GCO Sec. 16-1 to permit the Planning Division of Community Development to apply for a Municipal Vulnerability Preparedness Grant (MVP) through the MA Executive Office of Energy and Environmental Affairs for a grant total of $2,000,000 to build out a Gloucester High School Flood Barrier in order for the protection of the GHS campus.  The grant requires a minimum local cash match of 25% that will be identified through a loan authorization request.**

COMMITTEE RECOMMENDATION:  On a motion by Councilor Hecht, seconded by Councilor Memhard, the Budget & Finance Committee voted 2 in favor, 0 opposed,1 (Cox) absent, to recommend that the City Council in accordance with MGL c. 44, §64 to approve payment of a prior year invoice for the city's landfill monitoring at Magnolia Woods, Tighe & Bond, Invoice #061897210 dated 6/15/2018 for a total of $13,225 from FY2018 and the invoice to be paid with FY2019 General Fund, DPW-Public Services budgeted funds.

DISCUSSION:

**Councilor Memhard** advised this payment with FY19 funds is for the contractor who does the landfill testing and monitoring for the city.  The DPW received a late bill and the purchase order was already closed, and that this is a bookkeeping matter.

**MOTION:  On a motion by Councilor Memhard, seconded by Councilor Hecht, the City Council voted 8 in favor, 0 opposed, 1 (Cox) absent, in accordance with MGL c. 44, §64 to approve payment of a prior year invoice for the city's landfill monitoring at Magnolia Woods, Tighe & Bond, Invoice #061897210 dated 6/15/2018 for a total of $13,225 from FY2018 and the invoice to be paid with FY2019 General Fund, DPW-Public Services budgeted funds.**

COMMITTEE RECOMMENDATION:  On a motion by Councilor Hecht, seconded by Councilor Memhard, the Budget & Finance Committee voted 2 in favor, 0 opposed, 1 (Cox) absent, to recommend that the City Council approve Special Budgetary Transfer 2019-SBT-11 in the amount of $22,500 from Police–Uniform, Accreditation Incentive, Account #0121151-519031, to Police-Uniform, Repairs & Maintenance-Communication Equipment, Account #0121152-524006, for the purpose of funding repairs and maintenance on Police Department radio infrastructure in order to provide reliable communications amongst public safety officials.

**DISCUSSION:**

   **Chief Conley** reported to B&F that this transfer of funds is in addition to $75,000 in state earmark funding will fully renovate the department's radio infrastructure in order to prevent outages and dead spots and build in redundancies which will have a big impact for his department.
   **Councilor O'Hara** asked about dead areas and how many there are.  **Chief Conley** advised they don't know for sure because radio wave propagation is a difficult thing to pinpoint.  The noted two ways of approaching the issue -- anecdotal evidence – officers in the lower parts of West Gloucester and Lanesville have difficulty under certain atmospheric conditions in transmitting from their portable radios which are less powerful than the radios in the cruisers.  He noted the "Christmas Tree lights" effect – if one light goes out, the whole string goes down which is the way their system currently works -- if one site goes down they'd all go down.  Now, with a new configuration, another site will take over immediately for repeater transmission purpose for receiver transmitters.

**MOTION:  On a motion by Councilor Memhard, seconded by Councilor Hecht, the City Council voted 8 in favor, 0 opposed, 1 (Cox) absent, to approve Special Budgetary Transfer 2019-SBT-11 in the amount of $22,500 from Police–Uniform, Accreditation Incentive, Account #0121151-519031, to Police-Uniform, Repairs & Maintenance-Communication Equipment, Account #0121152-524006, for the purpose of funding repairs and maintenance on Police Department radio infrastructure in order to provide reliable communications amongst public safety officials.**

COMMITTEE RECOMMENDATION:  On a motion by Councilor Hecht, seconded by Councilor Memhard, the Budget & Finance Committee voted 2 in favor, 0 opposed, 1 (Cox) absent, to recommend that the City Council approve the Gloucester Fire Department Billing and Collection Policy as presented by the EMS Coordinator and approved by the Mayor dated April 30, 2019 and further to approve the proposed fee schedule attached to and incorporated into the policy effective July 1, 2019.

**DISCUSSION:**

   **Councilor Memhard** mentioned that Firefighter/Paramedic Jonathan Sanger is the Fire Department's new EMS Coordinator, taking over from Sander Schultz.  He reported Mr. Sanger is doing an "able job," bringing fresh eyes and enthusiasm to the job.  **Fire Chief Eric Smith** mentioned changes, to this year's fee schedule are minimal, but now extends itself to services provided on scene patient care but with no transport to a hospital.  There are several insurance companies that will pay for this fee, he pointed out, and others aren't set up to do that yet.  He noted that this is an area that is increasing in popularity, that of community paramedicine.  He touched briefly on community paramedicine by highlighting this as becoming a trend that is a cost saving measure for insurance companies which he touched on briefly.

**MOTION:  On a motion by Councilor Memhard, seconded by Councilor Hecht, the City Council voted 8 in favor, 0 opposed, 1 (Cox) absent, to approve the Gloucester Fire Department Billing and Collection Policy as presented by the EMS Coordinator and approved by the Mayor dated April 30, 2019 and further to approve the proposed fee schedule attached to and incorporated into the policy effective July 1, 2019.**

COMMITTEE RECOMMENDATION:  On a motion by Councilor Hecht, seconded by Councilor Memhard, the Budget & Finance Committee voted 2 in favor, 0 opposed, 1 (Cox) absent, to recommend that the City Council authorize the write-off of $319,857.58 in uncollectible, outstanding ambulance billing.

**DISCUSSION:**

**Councilor Memhard** conveyed this that this write-off for uncollectible ambulance fees which is lower than last year, and advised that the department is working with their billing company to gain more information to make finding and billing transported patients' insurance companies better accountable. The city is gaining on this issue, he pointed out. The department provides services but isn't always compensated, he pointed out.

**Chief Smith** expressed this situation is unfortunate, but it's part of medical billing overall. It is either bad information gained on the street, legal barriers to obtaining information; hospitals don't want to share information electronically and won't let their billing company interface electronically either. In many cases if the hospitals gain information later, the Fire Department doesn't obtain that information nor does the billing company -- it's just not shared. Some patients may be homeless or aren't available to answer any questions. They can't put social security numbers on patient information to do legitimate billing. He advised Mr. Sanger has made many improvements to have better accountability and put pressure on the billing company. He advised they're doing all that they can.

**Councilor LeBlanc** expressed his concern for having to write off uncollectible ambulance fees, recounting that when he first came onto the Council the write off was about $600,000. **Chief Smith** noted they've attempted to use a collection agency to collect fees, which they don't like doing that because they are a public service agency. Even when they did hire a collection agency the department netted nothing. They look at the situation annually as does the City Auditor, he assured.

**Councilor O'Hara** asked about how Gloucester's write-off rates against other communities who have their own ambulance service. **Chief Smith** advised the city rates very well. The billing company makes their money on a percentage fee so the more money they bring in the more they're paid. There are areas of improvements that have been made, and Gloucester is far ahead of most communities, he reported, adding that there aren't a lot of fire-based ambulance services in the area to compare the city to. It is difficult to run emergency services as it has a red bottom line, especially in a demographic where most transports are covered by Medicare. **Councilor O'Hara** touched on the department's billing company with **Chief Smith** who mentioned that this is a top billing company and are one of the less expensive ones. He explained they charge 3% of whatever they bring in/collect. He mentioned using another billing company, in his experience in Michigan that charged 10% of collected fees, and touched on a net gain versus charges to the city for billing and being kept up with federal regulations. He mentioned "out clauses" in the billing company's contract if they determine they aren't getting the "biggest bang for their buck."

**MOTION: On a motion by Councilor Memhard, seconded by Councilor Hecht, the City Council voted 8 in favor, 0 opposed, 1 (Cox) absent, to authorize the write-off of $319,857.58 in uncollectible, outstanding ambulance billing.**

COMMITTEE RECOMMENDATION: On a motion by Councilor Hecht, seconded by Councilor Memhard, the Budget & Finance Committee voted 2 in favor, 0 opposed, 1 (Cox) absent, to recommend that the City Council under MGL c. 44, §53A accept federal grants in the amount of $662,525 for the Community Development Block Grant from the U.S. Department of Housing and Urban Development for Program Year 2019/Fiscal Year 2020 and the HOME Grant from the North Shore HOME Consortium for Program Year 2019/Fiscal Year 2020 in the amount of $87,110.

**DISCUSSION:**

**Councilor Memhard** noted that this is an annual acceptance of the CDBG funding used for public services, public facilities, economic development, fist time homebuyers and housing rehab as well as paying as some of the administrative costs for the grant. He advised that Ms. Cahill reported that since her tenure as Community Development Director they organize the program using the funds as intended for which he and Councilor Hecht applauded her for at the B&F meeting.

**MOTION: On a motion by Councilor Memhard, seconded by Councilor Hecht, the City Council voted 8 in favor, 0 opposed, 1 (Cox) absent, under MGL c. 44, §53A accept federal grants in the amount of $662,525 for the Community Development Block Grant from the U.S. Department of Housing and Urban Development for Program Year 2019/Fiscal Year 2020 and the HOME Grant from the North Shore HOME Consortium for Program Year 2019/Fiscal Year 2020 in the amount of $87,110.**

**Ordinances & Administration:    May 20**

There are no matters for Council action under this heading.

**Planning & Development:  May 22**

There were no matters for Council action under this heading.

**Scheduled Public Hearings:**

1.  **PH2019-025:  SCP2019-004: Fuller Street #35, Map 168, Lot 14, GZO Secs. 1.9, 3.1.6, 3.2.2 and 1.7 for a special permit to exceed the maximum allowable building height, decrease the minimum lot area per dwelling unit and decrease the minimum open space per dwelling unit in the NB/R-20 district (Cont'd from 5/14/19 & TBC 06/11/19)**

**This public hearing is opened at 8:33 p.m.**
       **Council President Lundberg** announced that at the request of the representing attorney for the Applicant, this matter is continued to June 11, 2019.
**This public hearing is continued at 8:33 p.m. to June 11, 2019.**

**For Council Vote:  None.**
**Individual Councilor's Discussion including Reports by Appointed Councilors to Committees:**

       **Update on the Tourism Commission by City Council Representative, Councilor Ken Hecht,** highlighted the Commission is recharged mentioning three new members with two new members in the pipeline.  These are active people who are excited and hardworking.  The two pillars of strength are the Cape Ann Chamber of Commerce and Discover Gloucester.  As a result, the Tourism Commission will look to seek changes in the Ordinance that governs their actions to better reflect their efforts on behalf of the city's tourism industry.

**Unfinished Business:**

       **Council President Lundberg** led a discussion with the Council on the process of naming a recipient of the Ab Khambaty Extraordinary Performance/Service Award which hadn't been awarded since its inception and given posthumously to its namesake.  It was determined that when the Councilors would identify one nominee amongst themselves and then through a Council Order put forward the name of a nominee for the Council's consideration under "For Council Vote."

**Individual Councilor's Discussion including Reports by Appointed Councilors to Committees:**
**Councilors' Requests to the Mayor:**
       **Councilor Hecht** announced that Mosaic Gloucester will have a first part of the installation on the face of the Americold Building on Rogers Street set for Thursday at 5:30 p.m.  The movie, "Lobster War" will be presented on Tuesday, June 4th at 7:00 p.m. at the Cape Ann Museum.  **Council President Lundberg** mentioned he had viewed this documentary and recommended it as a great description of the issues facing the lobster industry.
       **Councilor Holmgren** expressed her thanks to Councilor Gilman, Mayor Theken, Cape Ann Veterans Services; Sen. Bruce Tarr; Rep. Ann-Margaret Ferrante, Cong. Seth Moulton and Governor Baker and every single veteran, JROTC and Sea Cadet members and teachers for the "wonderful job" they did at the Memorial Day Ceremony.
       **Councilor Memhard** announced that Rocky Neck had difficult parking challenges this past weekend with the start of the summer season.  He mentioned that the Mayor reposted that Gloucester was recently in the national news again.  Deborah Kramer, a recognized national history author, had an article published this month in the national edition of Audubon Magazine featuring the Good Harbor Beach Piping Plovers talking about last year's saga and the changes the city has made working with the Animal Advisory Committee, the Mayor's Office and the City Council to create a more hospitable environment for the plovers while balancing the needs of a popular urban beach..
       **Councilor LeBlanc** recounted that tonight's Council meeting was a good example of such a great Council who can laugh together and get some serious business done.  He mentioned that Councilor Memhard, B&F Committee's Vice Chair, sitting in for Chair, Melissa Cox, brought a refreshingly new take on the Committee's Report to the Council this evening.
       **A motion was made, seconded and voted unanimously to adjourn the meeting at 8:50 p.m.**

**Respectfully submitted,**

*Dana C. Jorgensson*
**Clerk of Committees**

**DOCUMENTS/ITEMS SUBMITTED AT MEETING:**   **None.**

# <u>**Exhibit 2**</u>

"Fishtown Local: Why I write and fight"
Gloucester Daily Times
December 25, 2022

12/27/22, 7:13 PM
Case 1:22-cv-12060-DJC   Document 30-1   Filed 12/28/22   Page 24 of 64
Fishtown Local: Why I write and fight | Opinion | gloucestertimes.com

https://www.gloucestertimes.com/opinion/fishtown-local-why-i-write-and-fight/article_2d6accd8-82bf-11ed-9dc6-83f80d808ef0.html

# Fishtown Local: Why I write and fight

Fishtown Local | Gordon Baird
Dec 25, 2022





As the year ends, it seemed appropriate to write an open-ended letter that addresses why I, we, they — heck, most of Gloucester — continue to fight for the character and survival of our city. It appears that some local politicians, planners, influencers, departments heads, political fundraisers et al don't really "get" why "our side" are so concerned, incensed, committed to the battle and will continue to be so.

So, Jason, Ruth, Rick, Beverly, Shawn, Val, Scott, Co-Mayor Jill, realtors, builders, developers weren't you more than a little surprised at the depth and commitment of the opposition to 2022's effort to rezone the city? This effort was drawn out over 6 months, delayed, and repurposed — it was originally built around creating affordable housing, then quickly relabeled. It was debated in the wards and citywide, on the brave new world of Zoom and in the pages of the paper. Nine columns came out this writer. Folks went after me, personally and often inaccurately. But I didn't care — the battle was more important.

Drawing it out made it harder for the opposition to stay focused, but opinion was so stacked against basically doubling the zoning in all the wards and, most importantly, doing it with no notice or rights to the neighbors to hear the plans at the board level. The councilors treated the entire process very fairly, listened a lot and voted down the essence of the changes.

But, alas, we have only a year to go until it will come crashing back again. The forces that be think time is on their side. That the residents will lose interest and drop their Quixotic, old-fashioned views of neighborhood character and local control. But there's too much money involved. Planners will be back with new proposals that will look a lot like the old proposals. Their hope, no doubt, is that a new, more malleable council will be voted in that will see the process though this time. Councilor Jeff Worthley had a target on his back, clearly, and Tracy O'Neil has been redistricted out of her ward who, clearly, liked her a lot. They have a year to figure it all out.

The next election will be hugely important. So while Councilor Jason Grow continues his dismissal of low-growth instincts with his "let her rip" attitude to neighborhood build-out, wanting to stick it to Eastern Point and other rural areas west and north, in particular, here are a few counter opinions that represent the other side.

A quote from kids' book author Thyra Heder about why she chose Gloucester to write her latest book around:

"We'd visit friends who had a home in Gloucester. To me, Gloucester was just one of the most magical places in the world."

It was no contest. Nor was it for Mike Wheeler, Gloucester High School Class '61 — author, Harvard professor and Annisquam lifer, whose endorsement quote for the new "Gloucester Encounters" book caught my eye:

"This marvelous new book reminds us of how the tides and currents of time have shaped our city ... For those of us who have long lived here — and for visitors as well — the collection ratifies the notion that our often-contrarian, sometimes cranky, always beautiful Gloucester is truly out-of-the-ordinary, and a treasure we should cherish."

Not sure if Jason and the planners cherish it the way we do. Perhaps it should figure in your council votes next time.

Perhaps they should consider David Rosen's letter in the Times last year. Head of Landvest and a member of the Planning Board, he lives on Washington Street.

"The demand for larger homes is driven by the real estate market, and the real estate market is driven by maximizing sale prices. I have worked in dozens of communities throughout the Boston metropolitan area. The predominant trend in urban areas and suburban towns is to tear down smaller, more modest homes and replace them with significantly larger homes that are often built out to the maximum size allowed by regulations, in order to optimize selling prices. If this is allowed by our zoning regulations, it will happen here too. If you allow it, it will happen. It is, in fact, already happening throughout Gloucester."

"I chose to buy a house in the Riverdale section of the city because it is a neighborhood of relatively small lots and modest single family homes, like many neighborhoods in Gloucester. The character of these neighborhoods will be significantly changed. Where there are single family homes with 1-, 2-car garages (or often no garages at all), there would be two units allowed by right, with no review process, with 3-4 cars per lot. This will increase traffic and congestion.''

Straight from the horse's mouth.

The worry is that the oncoming Transit Overlay District (TOD) mandates will set some nasty precedents. Has anyone asked how many other towns are just saying no?

Or what happens if the council doesn't change the zoning? The funds threatened to be forfeited are "developer funds" that paid for the infrastructure build-out of the hotel and the mall extension. The state TOD plan is to make us a Regional Municipal Zone of Boston. We aren't.

Will we let those 2,270 new TOD units lead the rest of Gloucester into "killing the magic?" This why I fight and write.

Won't you join me?

*Gloucester resident Gordon Baird is an actor and musician, co-founder of Musician magazine and producer of "The Chicken Shack" community access TV show.*

Trending Video





SPONSORED CONTENT

Worried About Inflation? Here Are 5 Money Moves to…

# **Exhibit 3**

Gloucester High School
Google Maps



# **Exhibit 4**

"Rules for using Newell"
Gloucester Daily Times
August 28, 2014

https://www.gloucestertimes.com/sports/rules-for-using-newell/article_c1641842-2e4d-11e4-9ba7-0019bb2963f4.html

FEATURED

# Rules for using Newell

Nick Curcuru Sports Editor
Aug 28, 2014



MIKE SPRINGER/ File Photo /

A large crowd watched the opening ceremony from the grandstands of the new Newell Stadium in Gloucester last fall.

Mike Springer



It's called the city of Gloucester's Recreational Facilities Committee.

It is a new mayoral committee that was recently affirmed in place by the City Council. And it's a committee that has now drafted a series of rules and regulations for the use for New Balance Track and Field at Newell Stadium — which officials want to make more open to, accessible to, and used by the public.

The committee chairman is former Gloucester football coach Paul Ingram, while committee members are Assistant Director of Public Works Mark Cole, GHS Athletic Director Kim Patience, School Committee Chair Jonathan Pope, Ward 3 City Councilor Steve LeBlanc and former GHS football coach Gerry Hart.

The committee is still a work in progress, according to Hart, as they are looking for a youth sports representative and ways to define its role beyond Newell Stadium. The committee is also looking to expand its membership to better represent the community.

The recently outlined rules and regulations cover public use of the track and field, rules for use of the track and field, use by the Gloucester Public schools and other city departments and permits.

"The rules were drafted with the idea that the New Balance Track and Field at Newell Stadium is a valuable resource that needs to be accessible to the Gloucester community but used in a manner that is safe for the participants and preserves the facility for the long term," Hart said in an email to the Times. "The rules were drafted after consultation with communities with similar facilities and follow the recommendations of the manufacturers of the track and field surfaces."

Public use was the first thing addressed by the committee. The committee recognizes that the track and field were underutilized this summer and they are looking for ways to increase its use.

During the school year — which has technically begun, given that high school teams have started practice — the stadium track and field will be open to the public from 6 a.m.-2:30 p.m. and from 6-8 p.m. Monday through Friday. On Saturdays and Sundays the stadium will be open to the public from 8 a.m.-8 p.m.

During the summer (mid-June through mid-August) the stadium will be open to the public from 6 a.m.— 8 p.m.

Winter weather could affect these hours. If the hours of operation change due to weather from December 1 to March 1 the hours will be posted on a bulletin board at the entrance to the facility.

The stadium will be closed on several holidays including New Year's Day, Martin Luther King Day, President's Day, Easter Sunday, Patriot's Day, Memorial Day, July 4, Labor Day, Columbus Day, Veterans Day and Christmas.

When it comes to use of the track, lanes one and two are to be used by runners and joggers while lanes three, four, five and six are to be used by joggers and walkers.

Items that are prohibited for use at Newell Stadium are, anything with wheels including bicycles, tricycles, skateboards, roller blades, scooters baby strollers and wheel chairs; all food, sports drinks and beverages other than water, tobacco products of any kind, glass bottles or glass containers of any kind, sharp or penetrating

objects such as high heels, metal spiked cleats, track spikes greater than 1/8", sharp tipped javelins, tent stakes and corner flags.

Other prohibited items are chairs or tables, alcohol, tailgating or cooking of any kind, chemical ice packs, dumping ice on the track or field, materials such as posters that need to be taped, stapled or glued onto the bleachers, fireworks, dogs or pets and golfing.

Per the manufacturers recommendation only water and ice are allowed on the surface because the turf can be damaged by sports drinks and instant ice packs. As a result, the DPW is looking into providing an ice machine and accessible water for use on the turf according to Hart.

The Gloucester Public Schools will have first priority in requesting use of the facility followed by other city departments.

To obtain first priority, the Gloucester Public Schools will submit a list of requests by June 30 of each year, prior to the start of the school year, for fall sports activities and by February 1 for spring sports activities to the Recreational Facilities Committee.

The requests will include dates and times for practices, games and physical education classes. In the event of a schedule chance, notice of the change will be posted on the stadium bulletin board.

"The Gloucester School Department is provided with priority access free of charge for physical education classes, intramural sports and interscholastic sports," Hart said. "There is a tiered charge for others to use the facility. The charges are designed to give the DPW enough money to staff the facility on an extensive basis to allow for broad community access."

All other requests for use of the facility must be submitted and approved by the Recreational Facilities Committee.

Permit requests from Gloucester groups that have obtained permits for seasons and annual events in the past, such as youth sports and adult groups, will receive second priority provided they are submitted by July 1 for the fall and March 1 for the spring. Other permits will be handled on a first come first serve basis. Permits will be granted in no less than a one-hour basis.

When two applicants on equal footing apply for the same time frame, priority will be given to the traditional in-season sport, as defined by the high school sports season which includes football, field hockey and soccer in the fall and lacrosse and track in the spring.

Permits will be granted based on availability. Gloucester based groups will have precedence over non-Gloucester groups when scheduling the athletic field. Past permit holders will be given first consideration.

Case 1:22-cv-12060-DJC    Document 20-1    Filed 12/28/22    Page 33 of 64

Any group or individual that wishes to use the track and field must have a permit and the permit holder must be at least 21 years of age.

Requests to use the stadium's concession stand must be submitted to the Recreational Facilities Committee and the scoreboard may only be used by trained personnel.

There will be a city employee overseeing the track and field to make sure that pedestrians are using the correct equipment.

The Gloucester Fishermen's Athletic Association (GFAA), the grass roots organization that spear headed the fund raising efforts to help build the stadium, has also paid for security cameras tied to police headquarters, while an effective Neighborhood Watch program is also in place in the area of the school and field to help prevent vandalism.

Sports Editor Nick Curcuru can be reached at 978-675-2712, or via email at ncurcuru@gloucestertimes.com.

Trending Video



# **<u>Exhibit 5</u>**

City of Gloucester
Standing Committee Documents



**Create a Website Account** - Manage notification subscriptions, save form progress and more.    Website Sign In

City of
# GLOUCESTER
MAYOR GREG VERGA

**GOVERNMENT**    **DEPARTMENTS**    **RESIDENTS**    **BUSINESSES**    **VISITORS**    **HOW DO I**    



Search...

| City Council Documents |
| Current Votes & Notice of Adoption of Loan Orders |
| Standing Committee Documents |
| Zoning Amendment Information    + |

Home › Government › City Council › Standing Committee Documents

## Standing Committee Documents

### Committees

The four standing committees of the City Council are:

- Budget and Finance
- Ordinances and Administration
- Planning and Development
- Committee of the Whole

The Committee of the Whole is comprised of the entire City Council to deliberate a matter of interest and concern to the entire legislative body. Rather than referring the matter to three separate City Council Standing Committees, a Committee of the Whole is created as a fourth Standing Committee of the Council so that the Council can take up its deliberations in a committee-like atmosphere to consider a matter of importance to the Council as a whole.

### Standing Committee Members

| Budget and Finance | Ordinances and Administration | Planning and Development |
|---|---|---|
| R. Scott Memhard - Chair | Sean Nolan - Chair | Jason Grow - Chair |
| Tony Gross - Vice Chair | James W. O'Hara, Jr. - Vice Chair | Valerie H. Gilman - Vice Chair |
| Jeff Worthley - Member | Frank Margiotta - Member | Tracy O'Neil - Member |

### Agendas and Minutes

Agendas and packets are available prior to committee meetings. Minutes are also available following approval.

| Committee | Agendas and Packets | Minutes |
|---|---|---|
| Budget and Finance | View Most Recent \| View All | View Most Recent \| View All |
| Ordinances and Administration | View Most Recent \| View All | View Most Recent \| View All |
| Planning and Development | View Most Recent \| View All | View Most Recent \| View All |
| Committee of the Whole | View Most Recent \| View All | View Most Recent \| View All |



**Contact Us**

Gloucester City Hall
9 Dale Avenue
Gloucester, MA 01930

Staff Directory

**Popular Links**

Proposition 2 1/2 and your taxes

Land Use Codes

Boat Excise Tax Calculation

Boat Excise Abatement Application

Motor Vehicle Excise Tax Calculation

**Site Links**

Home

Site Map

Contact Us

Accessibility

Copyright Notices

# __Exhibit 6__

"Boston City Council Approves
Lowering Voting Age to 16"
NECN
November 30, 2022

in New England.

## NECN

☁ 30°

**TRENDING**    Sandy Hook: 10 Years Later    Eat New England    Morning Chat    RealiTea    Mom ...    ⌄

BOSTON

# Boston City Council Approves Lowering Voting Age to 16

If the measure is approved, Boston will become one of the largest cities in the U.S. to give 16- and 17-year-olds the power to vote

By Oscar Margain • Published November 30, 2022 • Updated on December 1, 2022 at 8:15 am

  



If approved by the state, Boston will be one of the largest cities in the country to give 16- and 17-year-old residents the right to vote in local elections.

Teenagers in Boston may soon be able to vote in local elections after the city council approved an amendment to lower the voting age to 16; the measure's fate now depends on Massachusetts legislators.

Boston wouldn't be the first city to make such move, but it could become one of the largest cities in the country to give younger residents the power to vote.

With a majority vote (9-4), the Boston City Council approved lowering the voting age to allow 16- and 17-year-olds to participate in local elections.

Co-sponsors Julia Mejia and Kenzie Bok introduced the amendment earlier this year after her former director of public policy, Jacob deBlecourt, persuaded her to bring it to the city council.

> ## Get New England news, weather forecasts and entertainment stories to your inbox. Sign up for NECN newsletters.

"Nothing is permanent," said deBlecourt, who helped draft the initial petition. "You know, you can make any change that you want."

It's time that 16- and 17-year-olds are represented in government, deBlecourt believes.

"A lot of young people are working jobs, are paying taxes, we have a bit of a belief that no taxation without representation is a thing we're supposed to believe in," said deBlecourt. "And this is a really good example of us trying to make that a reality because 16- and 17-year-olds play a major role in the city of Boston."

**Politics**



**3 HOURS AGO**

Supreme Court Keeps in Place Trump-Era Immigration Policy Known as Title 42



**11 HOURS AGO**

NY Rep.-Elect George Santos Admits Lies, Says, 'We Do Stupid Things in Life'

Case 1:22-cv-12060-DJC   Document 20-1   Filed 12/28/22   Page 39 of 64

Erin Murphy, one of the four members who voted against the measure, is concerned about voter privacy of teens, as records of registered voters become public. She doesn't believe waiting until 18 deters anyone from becoming civically engaged.

"I worry that certain kids would be influenced into voting for a certain candidate instead of really coming up with their own opinion," added Murphy.

"I do think I'm ready to vote," said Boston Collegiate Charter School student Jennifer Gil Naranjo.

The 17-year-old argued the newer generations have greater access to information and can make more informed decisions.

"We want, like, public transportation and public education to be fixed to be supported, to be helped, and a lot of students should understand that voting is their right," she said.

A handful of other municipalities have tried lowing the voting age, but those efforts failed to get state approval.

The Boston proposal needs to be signed by Mayor Michelle Wu before it goes to the Massachusetts Legislature.

This article tagged under:

**BOSTON** • **MASSACHUSETTS** • **BOSTON CITY COUNCIL**

   

Taboola Feed

SPONSORED • ENERGY BILL PROGRAM

**Massachusetts: Program Covers The Cost To Install Solar If You Own A Home In These Zips**

# **Exhibit 7**

"Beverly students push for lower voting age"
The Salem News
March 18, 2019



E-Edition    Events Calendar    Celebrations    Obituaries    Public Notices    Special Sections    Puzzles          Contact Us    Subscribe    Log in

Tuesday, December 27, 2022 | E-Edition

Search...





 Updated North Shore girls basketball leaders    City gets state money to help with bridge traff...    Leonard's two goals help keep Essex Tech hockey...    2022 Year in Review: Most read sports stories o...

FEATURED

# Beverly students push for lower voting age

By Paul Leighton Staff Writer    Mar 18, 2019



Beverly High School seniors Marley Norton, Nathan Levin, Rory Devlin and Emily Zieff, left to right, spoke to the City Council Monday night. Paul Leighton/Staff photo

f    ✕    in    📌    @

BEVERLY – Four seniors from Beverly High School made a pitch to city councilors Monday night to let 16- and 17-year-olds vote in Beverly's local elections, starting this November.

The students, members of a group called Vote16Beverly, said teens are mature and informed enough to vote and should be given the chance to develop the voting habit early.

"Sixteen-year-olds can drive. They can pay taxes. They can get married," Nathan Levin said during a presentation to the City Council. "But they can't vote."

The Vote16Beverly group, which includes Rory Devlin, Marley Norton and Emily Zieff, is part of national movement to lower the voting age for local elections. The City Council and Mayor Mike Cahill would need to approve a home-rule petition to make the change in Beverly. The petition would then be voted on by the state Legislature.

Levin said 16- and 17-year-olds should be able to vote in city elections because the issues at that level, from school safety to road repairs, affect them directly.





Kar's Nuts Peanut Almond Cashew Mixed ...
★★★★½ 3,962
$35.82 ✓prime    Add to Cart

$35.82 ✓prime    Add to Cart


COUPON DEALS

NEWSPAPER ADS
DANVERS AGWAY
INSTITUTION FOR SAVINGS (2)
Steve's
TACHE REAL ESTATE
THE BUTCHERY
Willoushby's (2)

Get your rewards



Home delivery and Digital Access customers of The Salem News get deals for restaurants, hotels, attractions and other businesses, locally and across the country.

He also noted that fewer than 25 percent of Beverly's registered voters voted in the 2017 local election. Levin said younger voters can influence their parents to vote. In Takoma Park, Maryland, which became the first city in the country to allow 16-year-olds to vote, the turnout more than doubled in later elections, he said.

Devlin said local elections are a good place for young people to start voting because the issues are most often not divided along Democrat and Republican lines.

"By allowing first-time voters their first experience in municipal elections, they're going to have to make these decisions based on merit and where these candidates stand on the issues, not based off of the letter that is next to your name," Devlin said.

Zieff addressed what she said is a "misconception" that younger voters would vote the same as their parents. She said a survey in Scotland, where 16-year-olds can vote, showed that 40 percent of 16- and 17-year-olds planned to vote differently than their parents.

City councilors will consider the students' proposal at a later date. But several councilors praised them for their presentation, and a couple of them indicated their support.

"I have learned a lot from you, and you have really challenged some of my own assumptions and my own misconceptions," Councilor Julie Flowers said. "You have more than convinced me."

"Older voters might be inspired by greater enthusiasm and participation by younger voters," Councilor Scott Houseman said. "For me this is a matter of trying to strengthen our democracy."

School Committee members John Mullady and Lorinda Visnick, who heard a presentation from the students last week, also spoke in support of the change, as did resident Elizabeth Ciampa.

The students said Beverly is one of eight communities in Massachusetts that are considering the lower voting age.

Staff writer Paul Leighton can be reached at 978-338-2675 or pleighton@salemnews.com.

### Support local journalism.

We are making critical coverage of the coronavirus available for free. Please consider subscribing so we can continue to bring you the latest news and information on this developing story.

Subscribe Today

Tags

### Trending Video



We are making critical coverage of the coronavirus available for free. Please consider subscribing so we can continue to bring you the latest news and information on this developing story.

Subscribe Today

Tags

### Trending Video



## Trending Recipes


Navy Bean And Ham Soup (In a Crock Pot)


Hawaiian Roll Ham Sliders


The Best Chicken Pot Pie



## The Salem News Podcasts —

The Salem News Podcasts

Check out our series of podcasts on topics from high school football to Halloween in Salem.


00:00                                    00:00

Salem News/MSO High School Football Podcast Week 10 of 2019: The Salem News' Phil Stacey, Matt Williams and Nick Giannino talk Week 10 of high school football on the North Shore with MSO's Web Radio's Bill Newell.

## This Week's Circulars



Salem News/MSO High School Football Podcast Week 10 of 2019: The Salem News' Phil Stacey, Matt Williams and Nick Giannino talk Week 10 of high school football on the North Shore with MSO's Web Radio's Bill Newell.

## This Week's Circulars



# **Exhibit 8**

"GHS graduates 'feeling good'"
Gloucester Daily Times
June 12, 2022

https://www.gloucestertimes.com/news/ghs-graduates-feeling-good/article_1f0f6cb6-ea99-11ec-87af-9f2456c4a0d5.html

# GHS graduates 'feeling good'

By Ethan Forman | Staff Writer
Jun 12, 2022



In an exuberant speech, Superintendent Ben Lummis touched on what was "a very hard, long school year" due to the pandemic, a more than two-year struggle that required the Class of 2022 to be resilient.

Lummis had everyone in the stands get on their feet for a standing ovation for the students, staff and school leaders.

Everyone seemed to be "feeling good" Sunday afternoon during the Gloucester High graduation exercises at New Balance Track and Field at Newell Stadium.

A cool sea breeze kicked in, providing relief from the warm temperatures for the hundreds packed in the stands. Many of the 194 soon-to-be graduates handed Principal James Cook small rubber ducks wearing black mortarboards as they accepted their diplomas. Cook carefully piled them up on a chair as they went by.

"It's getting crowded up here with all the ducks," he quipped.

The graduates received hugs and handshakes from those on the dais, including members of the School Committee and City Council, state Senate Minority Leader Bruce Tarr and Mayor Greg Verga. The Docksiders stage band even belted out the song "Feeling Good," and Class President Daniel Beaton had a little fun with Cook about his speech, joking that he liked Cook's "Nerd" speech the third time he heard it.

Cook's speech celebrated the embrace of his inner nerd, a term of derision in the 1980s that has somehow become a compliment today.

"Throughout high school," Beaton said, "we have faced many challenges and unique obstacles. Along the way, because of that, we have become more resilient and better than before. We went through practically two years of the pandemic and somehow still graduated. I mean learning pre-calculus and engineering over the computer was almost impossible, yet, somehow we did it. We are finally at the point we've been working towards, getting away from here," he said to laughs. "Now, it is time for us to go on by ourselves, exploring new horizons, new opportunities, relying on the values and lessons we have learned over the past four years, from both our amazing teachers and parents."

Earlier, Salutatorian Eliana Faria spoke about how she was not a big fan of change and how her impending graduation left her with a growing sense of panic. A conversation with her father helped change her outlook.

"But my biggest take-away from him was that change is a good thing and a much needed thing," she said. "This milestone for the Class of 2022 is a big one. It marks the start of independence and self-sufficiency and it marks the beginning of real-world experiences and exploration outside of Gloucester. It's this scary change that's allowing us to follow our dreams and make our own impact on this planet."

Valedictorian Ais Cook, one of the principal's kids, spoke about the need for community, noting how they had cried over leaving behind friends from middle school in their freshman year, friends who would eventually come up to Gloucester High. Cook said they shared high school with these younger friends and they even put on a musical together. They got to play soccer with the girl who was the first person they came out to, and Ais Cook said they got to write Gillnetter articles with a girl they wrote stories with as a child and with the two non-binary people who helped them come to terms with being non-binary, Cook said to applause.

"The point is, I found my people and they found me," Ais said.

In his greeting, Verga told the seniors: "You have overcome obstacles that so many others will never experience. Basically three out of four years of your high school careers were, let's say, a bit unorthodox. Please know that we are all impressed by your resiliency."

School Committee Chairperson Kathleen Clancy talked about the transition from high school, which was meaningful for her as her son, Neville, was a member of the class.

"And while we are filled with emotion, there is comfort in knowing that our children are more than ready for what lies ahead," Clancy said.

There was a touching moment midway through the awarding of the diplomas when Olivia Rose Pike's name was called in memoriam and her family and friends were invited up on stage to receive gifts and flowers, to a standing ovation. A member of the Class of 2022, Olivia died in April 2021 at age 17.

"Gloucester High School staff have been working closely with Olivia's mother and closest friends to properly honor Olivia's memory while also respecting her family's wishes," Lummis said in an email about honoring Olivia's memory prior to graduation on Sunday.

Ethan Forman may be contacted at eforman@northofboston.com.

Ethan Forman may be contacted at eforman@northofboston.com.

Trending Video

# __Exhibit 9__

"Students get an inside look at government"
Gloucester Daily Times
May 27, 2019

https://www.gloucestertimes.com/news/local_news/students-get-an-inside-look-at-government/article_1b58688e-761a-5bfe-b114-e43c7985284d.html

EDITOR'S PICK

# Students get an inside look at government

By Ray Lamont Staff Writer
May 27, 2019

 

More than two dozen Gloucester High School students are getting a close-up look at the city's government Tuesday through the resurrection of what is supposed to be an annual project, but had lapsed in recent years.

City and school officials have brought back Gloucester's Student Government Day, and – as of Saturday – 25 students had signed up to follow Mayor Sefatia Romeo Theken, Chief Administrative Officer James Destino, city councilors, department heads, School Committee members and others Tuesday as they carry out their duties across the city.

The students will, among other things, be sitting in on management meetings, attending Gloucester District Court proceedings, be in on a Massachusetts School Building Authority building committee meeting, and then attend a pre-council meeting reception with their parents and friends and the regular biweekly City Council meeting slated for 7 p.m. in CIty Hall's Kyrouz Auditorium.

The reception, which is open to the public, will run from 6:15 to 6:45 p.m., with cookies and cider on the table for refreshments. The students will then open the council meeting by leading the pledge of allegiance and spotlight for councilors and audience members what they learned throughout the day.

Ward 4 Councilor Val Gilman – who served on the organizing committee for the event with fellow councilor Jen Holmgren, City Clerk Joanne Senos, Superintendent of Schools Richard Safier, GHS Principal James Cook and Gloucester High School history teacher Rich Francis – said the rejuvenation of Student Government Day is tied, in part, to following a provision in the city's charter that calls for it to be presented annually.

But it also focuses on evolving civic education programs in Gloucester's schools, Gilman noted. Safier added that the Grade 8 program at O'Maley Innovation Middle School, which previously focused on World History, is now a full year of civics, aligned with and culminating with a student trip to Washington, D.C.

Gilman – who also praised Romeo Theken for supporting the project and encouraging city officials to accept the students and participate – said she hopes the program will once again be held each year.

"Going forward," she said, "we hope to make Student Government Day an annual event which will also include a mock city council meeting of GHS students deliberating and voting on an important city issues of interest."

Ray Lamont can be reached at 978-675-2705, or via email at rlamont@gloucestertimescom.

Trending Video

# <u>**Exhibit 10**</u>

Email from Defendants' Counsel
Requesting Hearing
December 14, 2022

Randazza Legal Group Mail - Gloucester/Worthley matter



Marc Randazza <mjr@randazza.com>

---

## Gloucester/Worthley matter
1 message

**Gregor Pagnini** <gpagnini@bhpklaw.com>                               Wed, Dec 14, 2022 at 3:43 PM
To: Marc John Randazza <mjr@randazza.com>
Cc: Matthew Hamel <mhamel@piercedavis.com>

Hi Marc,


As I believe you are aware, I serve as counsel to the Gloucester School District. I am writing to see if you and Mr. Worthley would be available on either Monday (12/20), before 10:00am or between 11:30am-2:00pm or Tuesday (12/21) sometime after 11:30am for a hearing, conducted via Zoom, regarding the no trespass order previously issued by the District regarding Mr. Worthley. The District's Assistant Superintendent, Amy Pasquarello will be conducting the hearing and I will be present, along with Matthew Hamel, copied on this email.


Please let me if and when you would like the meeting to occur within the timeframes above and I will send a Zoom link.


Thanks,
Greg

# <u>**Exhibit 11**</u>

Letter to Defendants' Counsel
Responding to Hearing Request
December 16, 2022



**Jay Marshall Wolman, JD**
Licensed in CT, MA, NY, DC

**16 December 2022**

<u>Via Email Only</u>

Gregor Pagnini, Esq.
Brody, Hardoon, Perkins & Kesten, LLP
<gpagnini@bhpklaw.com>

    ***Re:***     ***Jeffrey T. Worthley v. School Committee of Gloucester, et al***

Dear Attorney Pagnini,

As you are aware, our firm has the pleasure of representing Councilor Worthley in his case against your clients, the School Committee of Gloucester and Superintendent Lummis. Your e-mail of December 14, 2022, asked Attorney Randazza for his availability for a meeting. For the sake of clarity, we are happy to meet with you, Lummis's Assistant Superintendent, and/or Attorney Hamel. However, you used the word "hearing", which does not appear to be in order.

Superintendent Lummis issued the No Trespass Order without notice or hearing. Prior to him doing so was the time for notice and a weighing of the evidence before issuing the No Trespass Order. Now, a hearing would simply serve to ratify the "shoot first, ask questions later" approach. Chief Conley himself observed (with tacit approval from Gloucester Counsel Egan) that Councilor Worthley would not receive due process, and there is no reasonable expectation that the defendants have changed their approach.

A fair hearing is now impossible within the meaning of G.L. 30A, §§ 10 & 11. "It is the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit." Mass. Const. Para 1, Art. 28. As future Justice Lauriat found, this requirement applies in administrative proceedings. *Pierce v. Mulhern*, No. 2001-2825-C, 2003 Mass. Super. LEXIS 488, at *22-23 (Jan. 27, 2003)(Lauriat, J., collecting cases). No matter how impartial Ms. Pasquarello might believe her to be, she directly reports to Lummis, who has been sued personally. If she issues any ruling in Mr. Worthley's favor, that is against Lummis's pecuniary interest. Such a ruling would, of course, be used against him in Court. She knows that he can retaliate against her for doing so. This is a clear conflict of interest, which is a basis for disqualification. *Pierce* at *24 citing *Schweiker v. McClure*, 456 U.S. 188, 195 (1982). She has a personal stake in the outcome of any such hearing and cannot be impartial.

And, apparently, she is being provided counsel by yourself and Attorney Hamel, who are obligated to protect Lummis's personal assets. Presumably, she has had *ex parte* communications with you, Lummis, and others, on this matter. Moreover, should Lummis be subpoenaed as a hostile witness, she is apt to give his testimony undue weight. In essence, Lummis would be acting through her. One cannot be "a party to and judge of the same event." *Pierce*, supra at * 39.

---

Randazza Legal Group
Page 2 of 2



Lummis's decision is a final one.  By its own terms, there is no further process.  A post-suit, *ad hoc* hearing, held by his subordinate, simply evidences the arbitrary and capricious manner in which the defendants have approached this issue.  This is gamesmanship; it is not due process.

There will be a hearing, but it will be before a judge, not a kangaroo court.  But, if you wish to have a meeting to negotiate the terms of your withdrawal of this unjust arbitrary order and what you can do to clear Councilor Worthley's name, which your clients knowingly and willingly besmirched, we will happily do so.  Should Lummis's assistant superintendent intend to move forward with this "hearing", we will be forced to seek injunctive relief.

Thank you for your attention to this matter.

Sincerely,

Jay M. Wolman

cc:    Matthew Hamel, Esq.

        Marc J. Randazza, Esq.

# __Exhibit 12__

Declaration of Jeffrey T. Worthley

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| |
|---|
| JEFFREY T. WORTHLEY, |
|            Plaintiff, |
| v. |
| SCHOOL COMMITTEE OF GLOUCESTER; and BEN LUMMIS, in his official and personal capacities, |
|            Defendants. |

Civil Action No. 1:22-cv-12060

**DECLARATION OF
JEFFREY T. WORTHLEY**

I, Jeffrey T. Worthley, declare the following:

1.      I am the Plaintiff in the above-captioned matter and I have personal knowledge of the within facts.

2.      I am a Councilor at large on the Gloucester City Council.

3.      I have been vocal in resisting efforts to change Gloucester from working-class to a real estate agent's paradise. I led the opposition to taking away neighbors rights to notification and input to rampant development, I've taken my role seriously as a City Councilor with regards to the expected checks and balances residents deserve, and I've been a vocal proponent of increased volunteerism being a very active volunteer myself. I recently organized an enormous clean up event in a neighborhood and motivated a record 84 people to join my two children, a 12-year-old girl and 13-year-old boy, who also inspired their peers to join in.

4.      The NTO prohibits me from driving or walking the length of Leslie O'Johnson Road, which passes through the GHS parking lot. It prohibits me from using the open-to-the-public running track surrounding the GHS football field. It prohibits me from even "appearing" at an

event off GHS grounds, such as GHS hockey games, which take place at a facility nowhere near GHS.

5.      I have been prohibited from attending the Sawyer Medals award ceremony for Gloucester High School students, which are customarily attended by local politicians, as represented by the below true and correct copy of a Gloucester Public School Facebook post:



6.      I have been prohibited from attending a workshop held by Lynn Lyons, renowned author and psychotherapist, discussing how a child's anxiety can take over a family's routines, and

tips for caregivers on specific actions that can be taken to better handle stressful situations that children encounter, as represented by the below true and correct copy of a Gloucester City Councilor Val Gilman's Facebook post:



7.     I was prohibited from attending the GHS drama club's performance of "Clue: On Stage", as represented by the below true and correct copy of a Gloucester City Councilor Val Gilman's Facebook post:



8.     In addition to the above examples, I was prohibited from attending A GHS boys soccer banquet at the Elks Club in Gloucester, and the Thanksgiving Day GHS home football

game. Ben Lummis, per the City Attorney, has already stated that there would be no exception for Memorial Day, where my eighth-grade son will be playing taps. This is not an exhaustive list of Gloucester school events which I have been prohibited from attending.

9.      The order prohibits me from attending upcoming events, which I would attend, including any upcoming awards ceremonies; high school graduation ceremonies (which local politicians attend); and even from traveling the length of Leslie O'Johnson road, which passes through GHS property.

10.     Local politicians in Gloucester are expected to attend such events.  They may not be compelled to, but as a sitting Councilor, my absence would be noticed, and as a Councilor seeking future re-election or election to other offices, my absence puts me at a distinct disadvantage as to other candidates.

11.     Despite the fact that the voting age is 18, my communications to future voters have always been targeted to civic involvement and awareness of community issues.  I am far from alone in this, as this is how all local politicians in Gloucester operate.  Educate voters early on these issues, and when they vote, those lessons and contacts make a difference.

12.     My ability to serve my constituents and to seek future support are severely handicapped by the Order.

13.     I believe that this is the intent of the order, and not some statement to the contrary that it is about "safety," as there has been no allegation nor even stated suggestions that anyone was in danger in any way.

14.     I have been asked by City Council President Val Gillman to work on Student Government Day.  This event always involves contact between students and city officials, and I am now not able to do so, for as long as the Order is in place.

14. I have been asked by City Council President Val Gillman to work on Student Government Day. This event always involves contact between students and city officials, and I am now not able to do so, for as long as the Order is in place.

15. I am a member of the Budget and Finance Committee for the Gloucester City Council.

16. As part of the Budget and Finance Committee, I am tasked with voting on appropriations for the school budget, and I am the only City Council member prohibited from coming to GHS to inspect claims of budgetary needs.

I declare under the penalty of perjury the foregoing is true and correct.


Date Executed: ____12/28/22____


_____
Jeffrey T. Worthley

# **<u>Exhibit 13</u>**

Declaration of Cassidy S. Curran

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JEFFREY T. WORTHLEY, <br><br>         Plaintiff, <br><br> v. <br><br> SCHOOL COMMITTEE OF GLOUCESTER; and BEN LUMMIS, in his official and personal capacities, <br><br>         Defendants. | Civil Action No. 1:22-cv-12060 <br><br><br> **DECLARATION OF** <br> **CASSIDY S. CURRAN** |

I, Cassidy S. Curran, hereby declare:

1.      I am over 18 years of age and have never been convicted of a crime involving fraud or dishonesty. I have knowledge of the facts set forth herein, and if called as a witness, could and would testify thereto.

2.      I am a Paralegal employed at the law firm of Randazza Legal Group, PLLC ("RLG"), counsel for Plaintiff in the above-captioned matter.

3.      I submit this declaration in support of Plaintiff's Reply in Support of Motion for a Preliminary Injunction ("the Reply"), filed herewith.

4.      On December 27, 2022, at 7:09 PM eastern time, while at my home and using the Google Chrome browser on a MacBook Air laptop, I visited the Gloucester City Council's PDF file titled "May 28 2019-CCM.pdf" at the URL: https://gloucester-ma.gov/Archive/ViewFile/Item/10646.  Immediately after visiting this page, I created a printout of it using the Chrome browser's "print to PDF" function. A true and correct copy of this PDF is attached to the Reply as **Exhibit 1**.

5.      On December 27, 2022, at 7:13 PM eastern time, while at my home and using the

Google Chrome browser on a MacBook Air laptop, I visited the Gloucester Daily Times article titled "Fishtown Local: Why I write and fight" at the URL: https://www.gloucestertimes.com/opinion/fishtown-local-why-i-write-and-fight/article_2d6accd8-82bf-11ed-9dc6-83f80d808ef0.html.  Immediately after visiting this page, I created a printout of it using the Chrome browser's "print to PDF" function. A true and correct copy of this PDF is attached to the Reply as **Exhibit 2**.

6.     On December 27, 2022, at 7:16 PM eastern time, while at my home and using the Google Chrome browser on a MacBook Air laptop, I visited the Gloucester Daily Times article titled "Rules for using Newell" at the URL: https://www.gloucestertimes.com/sports/rules-for-using-newell/article_c1641842-2e4d-11e4-9ba7-0019bb2963f4.html.  Immediately after visiting this page, I created a printout of it using the Chrome browser's "print to PDF" function. A true and correct copy of this PDF is attached to the Reply as **Exhibit 4**.

7.     On December 27, 2022, at 7:17 PM eastern time, while at my home and using the Google Chrome browser on a MacBook Air laptop, I visited the City of Gloucester's web page titled "Standing Committee Documents" at the URL: https://gloucester-ma.gov/123/Standing-Committee-Documents.  Immediately after visiting this page, I created a printout of it using the Chrome browser's "print to PDF" function. A true and correct copy of this PDF is attached to the Reply as **Exhibit 5**.

8.     On December 27, 2022, at 7:20 PM eastern time, while at my home and using the Google Chrome browser on a MacBook Air laptop, I visited the NECN article titled "Boston City Council Approves Lowering Voting Age to 16" at the URL: https://www.necn.com/news/politics/boston-city-council-approves-lowering-voting-age-to-16-pending-approval-from-wu-state/2880449/. Immediately after visiting this page, I created a printout of it using the Chrome

browser's "print to PDF" function. A true and correct copy of this PDF is attached to the Reply as **Exhibit 6**.

9.      On December 27, 2022, at 7:23 PM eastern time, while at my home and using the Google Chrome browser on a MacBook Air laptop, I visited the Salem News article titled "Beverly students push for lower voting age" at the URL: https://www.salemnews.com/news/local_news/beverly-students-push-for-lower-voting-age/articl e_d141545b-4f06-57f7-9ef8-7432f6d18ae0.html. Immediately after visiting this page, I created a printout of it using the Chrome browser's extension "Awesome Screenshot". A true and correct copy of this PDF is attached to the Reply as **Exhibit 7**.

10.     On December 27, 2022, at 7:28 PM eastern time, while at my home and using the Google Chrome browser on a MacBook Air laptop, I visited the Gloucester Daily Times article titled "GHS graduates 'feeling good'" at the URL: https://www.gloucestertimes.com/news/ghs-graduates-feeling-good/article_1f0f6cb6-ea99-11ec-87af-9f2456c4a0d5.html. Immediately after visiting this page, I created a printout of it using the Chrome browser's "print to PDF" function. A true and correct copy of this PDF is attached to the Reply as **Exhibit 8**.

11.     On December 27, 2022, at 7:31 PM eastern time, while at my home and using the Google Chrome browser on a MacBook Air laptop, I visited the Gloucester Daily Times article titled "Students get an inside look at government'" at the URL: https://www.gloucestertimes.com/news/local_news/students-get-an-inside-look-at-government/ article_1b58608e-761a-5bfe-b114-e43c7985284d.html. Immediately after visiting this page, I created a printout of it using the Chrome browser's "print to PDF" function. A true and correct copy of this PDF is attached to the Reply as **Exhibit 9**.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: December 28, 2022.

*Cassidy Curran*

Cassidy S. Curran