**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| **JEFFREY T. WORTHLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 22-cv-12060-DJC** |
| | ) | |
| **SCHOOL COMMITTEE OF GLOUCESTER** | ) | |
| **and BEN LUMMIS, in his official and personal** | ) | |
| **capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                    **January 24, 2023**

## I.     Introduction

Plaintiff Jeffrey T. Worthley ("Worthley") has filed this lawsuit against Defendants School Committee of Gloucester and Ben Lummis ("Lummis"), Superintendent of Gloucester Public Schools (collectively, "Defendants"), bringing a civil rights action under 42 U.S.C. § 1983 alleging a violation of the First Amendment (Count I), Fourteenth Amendment procedural due process (Count II) and under Mass. c. 12, § 11I for retaliation (Count III) and violation of due process (Count IV).  D. 1-2.  Worthley has now moved for a temporary restraining order and a preliminary injunction striking the November 14th Order, D. 8.  For the reasons stated below, the Court ALLOWS Worthley's motion for injunctive relief as to the November 14th Order, D. 8.

## II.     Standard of Review

As to Worthley's motion, the Court must consider:  "[1] the movant's likelihood of success on the merits of [his] claims; [2] whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; [3] the balance of hardships as between the parties; and [4] the

1

effect, if any, that an injunction (or the withholding of one) may have on the public interest." <u>Corp. Techs., Inc. v. Harnett</u>, 731 F.3d 6, 9 (1st Cir. 2013) (citing <u>Ross-Simons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d 12, 15 (1st Cir. 1996)). "Likelihood of success [on the merits] is the main bearing wall of [this] framework." <u>Ross-Simons</u>, 102 F.3d at 16; <u>Coquico, Inc. v. Rodríguez-Miranda</u>, 562 F.3d 62, 66 (1st Cir. 2009) (stating that whether the movant's claim likely will succeed on the merits "normally weighs heaviest in the decisional scales"). Irreparable harm, on the other hand, is measured "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." <u>Gedeon v. City of Springfield</u>, No. 16-cv-30054-MGM, 2017 WL 4212334, at *8 (D. Mass. Feb. 24, 2017) (quoting <u>Braintree Labs., Inc. v. Citigroup Global Mkts., Inc.</u>, 622 F.3d 36, 42–43 (1st Cir. 2010)).

Preliminary injunctive relief is an "extraordinary and drastic remedy." <u>Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.</u>, 645 F.3d 26, 32 (1st Cir. 2011) (quoting <u>Munaf v. Geren</u>, 553 U.S. 674, 689–90 (2008)). The plaintiff "bears the burden of establishing that these four factors weigh in its favor." <u>Esso Standard Oil Co. (P.R.) v. Monroig-Zayas</u>, 445 F.3d 13, 18 (1st Cir. 2006) (citation omitted).

## III.   Factual Background

The following facts are drawn from Worthley's complaint, D. 1-2, the affidavits submitted in support of Defendants' opposition, D. 17-1; D. 17-2, and Worthley's affidavit filed in support of the complaint, D. 1-2 at 20-27 and with his reply brief, D. 20-1 at 54-59, and the various exhibits filed by the parties.

### A.   <u>Initial Contact Between Worthley and KF at Gloucester High School</u>

Worthley is a Councilor at-Large on the City Council for Gloucester, Massachusetts ("the

City"). D. 1-2 ¶ 1; D. 20-1 ¶ 2. On November 8, 2022, Worthley went to vote at Gloucester High School ("GHS"), his polling station. Id. ¶ 8. The parties offer different versions of what occurred at GHS that day. Worthley alleges that he introduced himself to a group of students hosting a bake sale and commended them for their efforts. Id. ¶ 10. KF, who is sixteen years old, identified herself as a student government leader and introduced herself in response. Id. Worthley relayed his own experiences in student government at GHS. Id. ¶ 12. He also shared his ideas about how to increase civic engagement and fundraising. Id. Worthley mentioned that the City Council president was interested in reinstituting "student government day" and KF expressed keen interest in the idea. Id. ¶ 14. Worthley also explained to KF that he had worked on a volunteer project to clean up a local field and that he had plans to create a volunteer corps. Id. ¶ 15. KF expressed interest in the project and asked Worthley for his phone number. Id. Worthley gave her his number and KF immediately dialed it and said "now you have my number too." Id. ¶¶ 16–17. According to Defendants (based on information from KF's mother), Worthley introduced himself, but did not specify exactly what he did within the City. D. 17-2 ¶ 5. KF's mother also told James Cook, the principal of GHS, that Worthley wanted KF's opinion on beginning a student government for the City and asked for her cell phone number so that he could send some ideas to her. Id. ¶ 6.

B.    **Subsequent Text Exchange Between Worthley and KF**

Later, Worthley sent a text message to KF at 1:49 p.m., wherein he explained his idea for "reinspir[ing] and reinvigorat[ing] volunteerism in our community" and asked KF about getting involved "in this movement." D. 1-2 at 29–30. KF responded that evening at 9:30 p.m., first apologizing "for the late text" then stating that she "wouldn't be able to respectfully dedicate myself to this movement, as I'm apart [sic] of a bunch of different clubs and boards through the school that take up a lot of my time. I'd love to get back to you and help out once things settle

down for me." <u>Id.</u> at 31.  Worthley responded "[t]his is definitely not too late.  I wouldn't advise it but I was up until 4am last nigh [sic] and at a meeting at 8 am . . . I'm either awake or my phone is on silent so it would never be a problem to text at any point." <u>Id.</u>  Worthley then said he "wouldn't need [KF] to dedicate any time to this movement at this point" and that he "just want[ed] to be able to consult with [KF] periodically on best practices to survey students" based on "what [her] schedule would allow." <u>Id.</u> at 33.  Worthley further indicated that he "completely underst[ood]" if KF "fe[lt] like even that is too much" and that "maybe [he] can work through the class advisors" on this idea.  <u>Id.</u>

According to Worthley, KF's father called him the next morning to explain that KF was overextended in her volunteer activities and that she would not be available to work on any of the programs they discussed.  <u>Id.</u> ¶ 27.  Worthley accepted KF's father's declination to participate on behalf of his daughter and told her father he would delete her number from his phone.  <u>Id.</u> ¶ 28. He then followed up with KF's father by summarizing the discussion in a text message.  <u>Id.</u> at 35-37,

According to Defendants (based on information from KF's mother), Worthley's text outlining his ideas and request that KF "take the lead and solicit other students to join his cause" made her feel very uncomfortable.  D. 17-2 ¶ 8.  KF felt "caught off guard by [Worthley] as what he texted her [did not] match up with what he discussed with her at the bake sale." <u>Id.</u> ¶ 10. Worthley also did not speak with one of KF's fellow students also present at the bake sale.  <u>Id.</u>  KF regretted giving her number to Worthley and was troubled by his disclosure of personal information about staying up late and waking up early.  <u>Id.</u> ¶ 11.  Accordingly, KF's mother instructed her daughter to text Worthley back and politely decline his request.  <u>Id.</u> ¶ 9.

C.     **Meeting Between Worthley and City Officials and the Issuance of the November 14th Order**

On November 14, 2022, City Attorney Suzanne Egan ("Egan") called Worthley to a meeting that also included Human Resources Director Holly Dougwillo and Police Chief Ed Conley ("Conley").  D. 1-2 ¶ 29; D. 17-1 ¶ 17.  According to Worthley, he was told the meeting was in reference to "inappropriate communications with a female minor student."  D. 1-2 ¶ 30.  At the meeting, Worthley shared the text messages with KF.  Id. ¶ 32.  Worthley alleges that despite being told by Conley that he had not committed a crime, id. ¶ 33; id. at 25, Egan "ambushed" him with an unsigned no trespass order during the meeting.  Id. ¶ 34.  Superintendent Lummis issued the signed no trespass order (the "November 14th Order") against Worthley that same day.  Id. ¶ 42; id. at 39.  The November 14th Order states in relevant part:

> This letter is delivered to officially notify you not to appear on or enter the premises of [GHS] during school hours or at any school sponsored event or activity from November 14, 2022 until the end of the 2022-2023 school year.   You are hereby forbidden to attend any [GHS] events, enter or remain in or upon [GHS] buildings or surrounding grounds while school is in session or while a school sponsored event or activity is taking place.
>
> ***
>
> It has been reported to me that . . . you approached a minor female student and used your official position as city councilor promising to assist her with her studies and extracurricular activities through your involvement in a school and city sponsored programs to obtain her personal cell phone number. You specifically targeted this female student and did not include the other students at the event, you did not seek the permission of an adult before obtaining the minor's telephone number, and you represented that you were involved in an official school or city program.  Later that evening you communicated with her about your sleeping habits and other personal interests.  When confronted by the female minor's parent, you misrepresented the facts and asserted that the student initiated the text communications.  This behavior is not acceptable behavior.  It poses a threat to the safety of the [GHS] community.

D. 1-2 at 39.

**D.    Initiation of this Lawsuit and Superseding of November 14th Order by January 13th Order**

Worthley initiated this action in Essex Superior Court.  D. 1-2.  Defendants removed the case to this Court.  D. 1.  Worthley has now moved for injunctive relief seeking to enjoin enforcement of the November 14th Order, D. 8.  The Court heard the parties on the pending motion on January 5, 2022.  D. 21.

During the January 5, 2023 hearing on Worthley's motion for preliminary injunction about the November 14th Order, the Court stated that it would take the matter under advisement but would delay ruling on the motion for a week with the hope that the parties could reach a resolution and gave the parties until January 12, 2023 to update the Court on the status of same.  See D. 21. On January 12, 2023, counsel for both parties submitted statements to the Court.  D. 23; D. 24. Defendants stated that they proposed several modifications to the November 14th Order, that the "[t]he parties continue[d] to engage in good faith negotiations" and that Defendants would "provide the Court with a further update by January 19, 2022" regarding these efforts.  D. 23 ¶¶ 3–4.  Worthley indicated that he rejected the proposed modifications because they did not address any of his requirements and raised "significant new First Amendment issues" and asked that the Court to grant the injunctive relief that he had sought.  D. 24 at 1.   On January 19, 2023, Defendants notified the Court that they issued a modified No Trespass Order against Worthley on January 13, 2023 ("the January 13th Order"), D. 28 ¶ 4; see D. 28-1, and that although Defendants had rejected Plaintiff's settlement offer, they were "engaged in further settlement discussions, which remain ongoing."  D. 28 ¶ 7.  The same day, Worthley filed an "emergency motion" for a status conference seeking a ruling on the pending motion regarding the November 14th Order.  D. 25.

In contrast to the November 14th Order, the January 13th Order does not bar Worthley from

school-sponsored events which are generally open to the public (provided that he adheres to Gloucester Public School policies), enumerated events to which "Gloucester City Councilors are customarily invited" and events or activities that relate to his "parental duties as the parent of a rising eighth grader," D. 28-1 at 2.  Like the November 14th Order, however, the January 13th Order otherwise prohibits Worthley from entering GHS "while school is in session from January 12, 2023 to the end of the 2022-2023 school year."  Id. at 3.  The January 13th Order also bars him from "represent[ing] [himself] as being a representative of, or involved in, Gloucester Public school-sponsored volunteer events to students, their families, or Gloucester Public School staff" and prohibits him from "solicit[ing] personal information from [GHS] students while on [GHS] property."  Id. at 2–3.

## IV.    Discussion

### A.    Worthley's Likelihood of Success on the Merits

#### 1.    Exception to the Mootness Doctrine

Although Worthley is no longer subject to the November 14th Order, here, the "voluntary cessation" exception to the mootness doctrine applies to warrant the Court's consideration of Worthley's motion for injunctive relief as to the November 14th Order, D. 8.  As its name suggests, this exception "can apply when a 'defendant voluntar[ily] ceases the challenged practice' in order to moot the plaintiff's case and there exists 'a reasonable expectation that the challenged conduct will be repeated following dismissal of the case.'"  Town of Portsmouth, R.I. v. Lewis, 813 F.3d 54, 59 (1st Cir. 2016) (alteration in original) (quoting Am. Civ. Liberties Union of Massachusetts v. U.S. Conf. of Catholic Bishops, 705 F.3d 44, 56 (1st Cir. 2013)).  "The voluntary cessation exception 'traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior.'"  ACLUM, 705 F. 3d at 54

(quoting City News & Novelty, Inc. v. City of Waukesha, 531 U.S. 278, 284 n. 1 (2001)).  Both conditions are satisfied here.

As to the first consideration, there is no dispute that Defendants voluntarily ceased most of the restrictions that Worthley challenged in the November 14th Order through the issuance of the January 13th Order.  See D. 28-1.  One of Worthley's principal contentions with the November 14th Order was that it was not narrowly tailored and violated his First Amendment right to free speech because it prohibited him from attending school-sponsored events and activities for the rest of the school year.  D. 10 at 11.  Defendants voluntarily ceased part of the challenged practices by issuing the January 13th Order, which now allows Worthley to attend school-sponsored events which are generally open to the public and certain, enumerated school events to which city councilors are customarily invited.  D. 28-1 at 2.

As to the second consideration, Defendants only modified the January 13th Order following the filing of this case and a hearing on the pending motion where the Court expressed its concerns about the breadth of the Order, and even that modified order contains some restrictions on Worthley's conduct.  See D. 28-1.  On this record, there "exists a reasonable expectation that the challenged conduct will be repeated."  See Knox v. Employees Intern. Union, Local 1000, 567 U.S. 298, 307-08 (2012).

Because the Court finds that the voluntary cessation exception to the mootness doctrine applies to the November 14th Order, the Court will proceed with addressing the four-prong test for the present motion for injunctive relief.

    2.    *Free Speech Claim*

Worthley alleges several constitutional defects in the November 14th Order.  D. 1-2 at 13–16.  The Court turns to his First Amendment free speech claim.  Although, as the movant, Worthley

bears the burden of establishing that a preliminary injunction should issue, Defendants shoulder much of the burden when it comes to the merits of Worthley's First Amendment claim. See United States v. Playboy Ent. Grp., Inc., 529 U.S. 803, 816 (2000) (noting "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions") (citation omitted).

"[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." Heffron v. Int'l Soc. for Krishna Consciousness, Inc., 452 U.S. 640, 647 (1981). Under the prevailing constitutional framework, the extent to which a "government can restrict speech turns on the category to which property is assigned." Curnin v. Town of Egremont, 510 F.3d 24, 28 (1st Cir. 2007). The Supreme Court has "identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 802 (1985); Curnin, 510 F.3d at 28. A school during school hours is typically a nonpublic forum. Nurre v. Whitehead, 580 F.3d 1087, 1093 (9th Cir. 2009). A school can become a public forum, however, "if school authorities have by policy or by practice opened those facilities for indiscriminate use by the general public, or by some segment of the public, such as student organizations." Id. (quoting Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267 (1988)) (internal quotation marks omitted); see Johnson v. Perry, 859 F.3d 156, 175 (2d Cir. 2017) (concluding that a school's gym was a limited public forum during a basketball game to which the public was invited to). Worthley's challenge focuses on the prohibition in the November 14th Order that concerns events at GHS when it is otherwise open to the public and at least a limited public forum.

The November 14th Order does not contain content-based regulations which are "are

presumptively invalid." <u>R.A.V. v. City of St. Paul, Minn.</u>, 505 U.S. 377, 382 (1992) (citations omitted).   "Content-neutral" time-place-manner regulation, on the other hand, "generally commands what we have termed 'intermediate scrutiny.'" <u>Bl(a)ck Tea Soc'y v. City Of Bos.</u>, 378 F.3d 8, 12 (1st Cir. 2004) (quoting <u>Nat'l Amusements, Inc. v. Town of Dedham</u>, 43 F.3d 731, 736 (1st Cir. 1995)).  Such regulations are only valid if they are "narrowly tailored to serve a significant governmental interest" and leave "open ample alternative channels for communication of the information.'" <u>Cutting v. City of Portland, Maine</u>, 802 F.3d 79, 84 (1st Cir. 2015) (alterations in original) (quoting <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989)) (internal quotation marks omitted). "In order to be narrowly tailored, a time, place, or manner restriction must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" <u>Cyr v. Addison Rutland Supervisory Union</u>, 60 F. Supp. 3d 536, 548 (D. Vt. 2014) (quoting <u>Ward</u>, 491 U.S. at 799).

In <u>Cyr</u>, a school district issued a content-neutral notice against trespass that banned a parent from all school property for two years because school staff felt threatened by the parent.  <u>Id.</u> at 540.  While the parent had a long, controversial history of criticizing the school district for its education of his autistic son, there were two events that immediately precipitated the ban. The first was that his son told a therapist that he wanted to attack a principal with an ax; school officials believed he was repeating his father's words.  <u>Id.</u>  A few days later, after demanding to visit the school shortly before the school year started, the parent drove through the school's driveway with his family, honked, and waved.  <u>Id.</u>  The principal found the parent's actions threatening in light of his repeated demands to visit that day and his son's recent comments to the therapist and issued a no-trespass order to the parent.  <u>Id.</u>  The district court, however, determined that the ban was not narrowly tailored:

> [The school district's] categorical ban was not tailored to respond to the specific threat that [the parent] potentially posed, a threat that was never articulated as anything more specific than "a potential risk of violence to [school personnel]."  If the [school district's] goal in issuing a notice against trespass to [the parent] was to protect school staff, then it could have drafted a notice against trespass that was in effect only during school hours or posted a police officer at public meetings held on [school district] grounds.  Also, the [school district] could have moved school board meetings to a neutral and secure location.

Id. at 548–49.  In other words, the school district's categorical ban was overbroad given the nature of the alleged public safety and the alternatives available.

Similarly here, the November 13th Order is overbroad even given the alleged concern articulated by Defendants.  Barring Worthley from all school-sponsored events or activity at GHS, regardless whether they are open to the public or traditionally attended by members of the City Council is overbroad given the articulated concern about obtaining a minor's cell phone number and communicating with her without the permission of an adult.  D. 17-1.  Conversely, the enforcement of the November 14th Order also would not have prevented Worthley from being present at GHS on November 8th as he was not attending a school-sponsored event, but was there to vote as GHS was his polling location that night.  Id.  Worthley is readily likely to succeed in showing that the November 14th Order is not narrowly tailored because it substantially burdens more of his speech (i.e., communications with others, including but not limited to Worthley's constituents as a City Councilor, attending school-sponsored events that are otherwise open to the public but which Worthley is prohibited from attending, see, e.g., D. 20-1 ¶¶ 5-9) than is necessary to fulfill Defendants' legitimate government interest in preventing an exchange of phone numbers and text messages with a minor child without the permission of an adult.  Moreover, it is not clear that the breadth of the November 14th Order leaves open "ample alternative channels for communication," particularly where school-sponsored events at GHS are open to the public and/or

generally attended by other city councilors, presumably interested in meeting with constituents at such events.  See id.

Defendants defend the November 14th Order by contending that it merely prohibits Worthley's physical presence at the school and dispute that "texting with a minor female high school student without her parents' permission" was constitutionally protected.  D. 17 at 8, 11. Defendants' argument fails to consider, however, that in banning Worthley from all school sponsored events or activities, the November 14th Order prospectively restricts far more speech than Worthley's communications with high school students without their parents' permission. While there is little question that student safety is a significant government interest, Coffelt v. Omaha Sch. Dist., 309 F. Supp. 3d 629, 637 (W.D. Ark. 2018) (citing Lovern v. Edwards, 190 F.3d 648, 655–56 (4th Cir. 1999)), "[f]ear of serious injury cannot alone justify suppression of free speech and assembly. . . .  [t]o justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced."  United States v. National Treasury Employees Union, 513 U.S. 454, 475 (1995) (citation and internal quotation marks omitted). Particularly as it appears uncontested that members of City Council regularly attend school-sponsored events at GHS, see D. 28-1 at 2, the scope of the November 14th Order also prevents Worthley from speaking with constituents in this limited public forum while other members of the public (including other City Councilors) are not so barred.

Having considered the record before the Court, Worthley has a reasonable likelihood of success of showing that the breadth of the time, place and manner restriction of the November 14th Order does satisfy intermediate scrutiny.

While the Court recognizes Defendants' concern about an adult texting a minor without parental consent, the context of the interaction in a public space of the GHS polling place and later

in the text exchange between Worthley and KF does not suggest a "reasonable ground to fear that serious evil" would result such that Worthley needed to be banned from all school-sponsored events and activities at GHS.  See National Treasury Employees Union, 513 U.S. at 475.

It is instructive that courts have disapproved of similarly broad bans from school property on the basis of doubtful public safety concerns.  In Coffelt, 309 F. Supp. 3d at 643–44, a district court concluded that an indefinite ban from events on school district property that were open to the public was an unreasonable response to "a heated discussion in a closed-door meeting."  In McBreairty v. Sch. Bd. of RSU 22, No. 1:22-CV-00206-NT, 2022 WL 2835458, at *11 (D. Me. July 20, 2022), a district court concluded that it was unreasonable to ban an individual from all school property for eight months after the individual made a comment at a school board meeting that referred to sexual conduct.  Moreover, courts that have approved broad bans from school property have done so where the threat to public safety was on firmer ground.  In Davison v. Rose, 19 F.4th 626, 637 (4th Cir. 2021), the Fourth Circuit concluded that the issuance of no-trespass letters that prohibited a parent's presence on school property and attendance at any school-sponsored activities did not violate the First Amendment because the parent had "made allusions to American Sniper," said "SHOTGUN" and "BE PREPARED" in reference to public meetings, called the public school a "target rich environment," and made a reference to public officials meeting their creator.  In Mejia v. Holt Public Schools, No. 5:01-CV-116, 2002 WL 1492205, at *1, *4 (W.D. Mich. 2002), a district court concluded that school authorities could ban a father from school grounds indefinitely because he masturbated in his car parked in the school parking lot while waiting to pick up his child at an elementary school.  In Wood v. Arnold, 321 F. Supp. 3d 565, 581 (D. Md. 2018), the district court concluded that a no trespass order did not violate the First Amendment after a parent threatened to disrupt school-related functions.

Here, even as alleged by Defendants, Worthley's conduct cannot reasonably be compared to such conduct that justified the broad bans from school property in the latter set of cases cited above. In the November 14th Order, Lummis declares that Worthley "poses a threat to the safety of the [GHS] community." D. 1-2 at 39. A school official's determination that an individual poses a threat to school safety is, without more, insufficient to justify such a broad ban. See Cyr, 60 F. Supp. 3d at 548 (concluding that the school's categorical ban "was not tailored to respond to the specific threat that [the parent] potentially posed, a threat that was never articulated as anything more specific than 'a potential risk of violence'" to certain staff). This point is particularly salient on the contested record here, as Lummis subsequently told a local publication that "no student was ever in danger." D. 1-2 at 41.

For all of these reasons, the Court concludes that Worthley has a reasonable likelihood of succeeding on the merits of his First Amendment free speech challenge, asserted in Count I, to the November 14th Order.

### 3.    Remaining Claims

Worthley also asserts other federal and state constitutional claims (Counts II-IV). D. 1-2 at 13–16. Given that the Court finds that he has a reasonable likelihood of success on the merits of his free speech claim under Count I as to the November 14th Order, the Court need not reach the merits of Worthley's other claims at this preliminary stage. See, e.g., Schiavo ex rel. Schindler v. Schiavo, 357 F. Supp. 2d 1378, 1384 (M.D. Fla.), aff'd, 403 F.3d 1223 (11th Cir. 2005) (noting that, even where numerous claims are asserted, to "obtain temporary injunctive relief, they must show a substantial likelihood of success on at least one claim"); 725 Eatery Corp. v. City of New York, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) (stating "[p]laintiff need not demonstrate a likelihood of success on the merits of every claim—rather, they need only 'show a likelihood of

success on the merits of at least one of [their] claims'") (alteration in original).

    **B.**    <u>**Irreparable Harm**</u>

"As the Supreme Court has explained, 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" <u>Sindicato Puertorriqueno de Trabajadores v. Fortuno</u>, 699 F.3d 1, 10–11 (1st Cir. 2012) (quoting <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976)).  Because the Court finds that Worthley is likely to succeed on the merits of his First Amendment free speech challenge, "it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well." <u>Id.</u> at 15 (citation omitted).

Defendants' exclusion of Worthley, under the November 14th Order, from all school-sponsored events and activities has or would have the effect of barring him from: seeing his son perform at events held at GHS; engaging his constituents at school-sponsored events that city councilors customarily attend; and utilizing school-sponsored events and activities to recruit members of the community to join his volunteer corps project. D. 1-2 ¶¶ 45, 54, 63. In the absence of injunctive relief, Worthley's ban from these events constitutes irreparable harm.

    **C.**    <u>**Balance of Harms and Public Interest**</u>

Compared to the irreparable harm that Worthley will suffer in the absence of injunctive relief enjoining the enforcement of the November 14th Order, the Court finds that the harms to Defendants, on the present record, are, at best, speculative.  Defendants argue that they "have a well-established interest in the safety and security of the students in their care." D. 17 at 17 (citations omitted).  While the Court agrees that any such generalized interest in student safety is significant, without more factual development that shows how Worthley poses a safety risk to any students at GHS or that such concern could not be remedied by less restrictive means, this harm remains illusory and does not outweigh Worthley's demonstrated harm. <u>See</u> <u>Coffelt</u>, 309 F. Supp.

3d at 636 (finding that school district's claims of harm were "largely illusory and speculative" and concluding that balance of harms favored parent banned from public events on school property).

With respect to the public interest, "[p]rotecting rights to free speech is *ipso facto* in the interest of the general public." McBreairty, 2022 WL 2835458, at *12 (quoting Cutting v. City of Portland, No. 2:13-cv-359-GZS, 2014 WL 580155, at *10 (D. Me. Feb. 12, 2014) (internal quotation marks omitted)). Accordingly, the Court finds that granting the preliminary injunction also is in the public interest.[1]

## V.    Conclusion

For all these reasons, the Court ALLOWS Worthley's motion for injunctive relief as to the November 14th Order, D. 8.[2]

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[1] Under the circumstances here and the superseding of the November 14th Order, the Court waives the bond requirement under Fed. R. Civ. P. 65(c). See Da Silva Medeiros v. Martin, 458 F. Supp. 3d 122, 130 (D.R.I. 2020).

[2] While the January 13th Order does not implicate the same overbreadth issues as the November 14th Order, it contains some new limitations (e.g., unless otherwise provided, Worthley "shall not represent [himself] as being a representative of, or involved in Gloucester Public School-sponsored volunteer events to students, their families, or . . . school staff"). Although it is not clear that Worthley would be able to show a reasonable likelihood of success in a challenge to all aspects of the January 13th Order, particularly as it appears only to bar him from GHS grounds during school hours, see Warkevicz v. Berwick Area Sch. Dist., No. 4:15-CV-01922, 2016 WL 3753108, at *7 n.80 (M.D. Pa. July 14, 2016) (noting that "courts . . . are more likely to react amenably to narrowly tailored bans that state with particularity the justifications for such a ban, the temporal and geographic scope of such bans, and permit the banned individual, if appropriate and feasible, to engage in First Amendment activity . . ."), the enforceability of the January 13th Order is not before the Court and the Court does not reach it.

16